[No. 2094]

# STATE OF NEVADA, RESPONDENT, *v.* BERT SCOTT, APPELLANT.

[142 Pac. 1053]

1. HOMICIDE—TRIAL—INSTRUCTIONS.
    An instruction that self-defense is an affirmative defense and that before the jury can "acquit" on that ground it must appear that the killing of the deceased was "not" in necessary self-defense, is a clear misstatement of the law.

2. CRIMINAL LAW—APPEAL—HARMLESS ERROR—CLERICAL ERRORS.
    That a misstatement of the law in the court's instructions in a murder case was due to a clerical error will not render the error harmless.

3. CRIMINAL LAW—APPEAL—HARMLESS ERROR—PRESUMPTIONS.
    Where the court gives several instructions on the same subject, some being correct and others erroneous, injury must be presumed, unless the record clearly shows otherwise.

4. HOMICIDE—PROSECUTION—EVIDENCE—SUFFICIENCY.
    In a prosecution for homicide, evidence *held* insufficient to sustain a conviction of murder in the first degree.

5. HOMICIDE—APPEAL—HARMLESS ERROR.
    Where the evidence was insufficient to justify accused's conviction of murder in the first degree and the court erroneously charged on his contention of self-defense, a conviction of murder in the first degree shows that the charge was prejudicial.

6. HOMICIDE—SELF-DEFENSE—RIGHT OF.
    One attacked by another has the right to use his own judgment in determining what is necessary to repel the attack, and his right to kill his assailant in self-defense cannot be limited by what may appear to the jury to have been absolutely necessary.

7. HOMICIDE—EVIDENCE—DYING DECLARATIONS.
    The preliminary proof necessary for the admission of a dying declaration is for the court alone, and a request that the jury be withdrawn while such evidence is being heard should be granted.

8. HOMICIDE—EVIDENCE—DYING DECLARATIONS.
    Where the admission of a dying declaration is sought, it is not the province of the court to determine from the preliminary proof whether such declaration has been made, but whether the preliminary evidence warrants its submission to the jury, who are to judge whether the declaration is entitled to weight as a dying declaration.

9. CRIMINAL LAW—TRIAL—STATEMENTS OF JUDGE—"INSTRUCTION"— WHAT ARE.
    In a prosecution for homicide, where the state offered a purported dying declaration, oral statements by the court as to the nature of dying declarations and as to the weight of the one

offered, made in the presence of the jury upon admitting the declaration in evidence, must be considered as an uncalled-for instruction.

10. CRIMINAL LAW—TRIAL—INSTRUCTIONS AS TO DYING DECLARA-TIONS—WEIGHT OF EVIDENCE.

It is error for the court to inform the jury that a dying declaration is entitled to the same weight as testimony under oath subject to cross-examination, because of the imminence of death doing away with the necessity of an oath.

11. CRIMINAL LAW—TRIAL—INSTRUCTIONS—WEIGHT OF EVIDENCE.

Remarks by the trial court, upon admitting in evidence a purported dying declaration, as to the weight of the declaration, and on the question whether it was made when the declarant believed death imminent, are erroneous, invading the province of the jury in violation of Const. art. 6, sec. 12, directing that the court charge only on matters of law.

12. CRIMINAL LAW—TRIAL—CONDUCT OF COUNSEL FOR STATE.

While a prosecuting attorney should be vigorous in the prosecution of crime, his duty is not solely to convict, and he should protect the rights of an accused person and not seek to take unfair advantage.

TALBOT, C. J., dissenting.

APPEAL from Sixth Judicial District Court, Humboldt County; *Edward A. Ducker*, Judge.

Bert Scott was convicted of murder in the first degree, and he appeals. **Reversed and remanded.**

*J. M. Frame*, for Appellant.

*Geo. B. Thatcher*, Attorney-General, *E. T. Patrick*, Deputy Attorney-General, and *J. A. Callahan*, District Attorney, for Respondent.

By the Court, McCARRAN, J.:

The defendant was convicted of murder in the first degree and his penalty fixed by the jury at life imprisonment. The court refused to grant him a new trial; hence this appeal.

From the record on appeal it appears that the deceased, Ben Swago, was associated in business with one Fouts, in the town of Rochester; the business consisting of a saloon and restaurant in the same building. The defendant Scott, as appears from the transcript, was employed by Fouts to represent him and in a way to oversee the

business in the interests of Fouts. On the evening of the 24th of February, 1913, the establishment was about to open, and on that occasion the bar was opened; the restaurant portion not having been completed. In the early part of the evening, the defendant, while in the kitchen at the rear of the barroom in a somewhat intoxicated condition, had urinated upon the floor. For this act he was accosted by the deceased. The defendant replied with angry and foul words, telling deceased, in effect, not to interfere with him or he would put him out of there; that he was the man that was making the money, whereupon the deceased struck the defendant several times. Bystanders intervened and stopped the fight and the two advanced to the front of the building, in which position the bar was located, and there, it appears, that a second altercation occurred, in which words was uttered, but no blows struck. At this time a woman by the name of Alice Miller, a prostitute with whom the deceased, Swago, had been consorting while in the town of Rochester, injected herself into the altercation between deceased and defendant, and after the second trouble, which occurred in the front of the saloon, Swago, the deceased, and the Miller woman left the saloon by the front door, passing out into the street. The record discloses that the defendant, after the second altercation, went behind the bar and took therefrom a revolver and walked out to the front door. At the front door, or thereabouts, the third altercation took place, in which the deceased was shot by the defendant.

The record in this case discloses evidence produced by the state, depicting the circumstances of three distinct altercations occurring in succession between the deceased and the defendant, in each of which the state's evidence undeniedly shows the deceased to have been the aggressor.

It is the contention of appellant that the verdict of murder in the first degree, entailing life imprisonment, is not supported by the evidence, as disclosed at the trial of this case. With this phase of the case we shall deal later.

At the trial of this case in the court below, the defendant interposed self-defense in justification of his act.

The evidence discloses an alleged dying declaration, made by the deceased, Swago, introduced by the state and in part reading:

"I am awful sick man and I might die before midnight. I don't see my way through. In Ollie's place I heard Scott say I show them how to run the joint. * * * When he told me that I couldn't stand it any longer so I hit him with my fist, then he rushed for a gun, and I walked out, and I was going back in again Scott come out of the door with a gun in his hand. His hand and gun were both in his coat pocket. He had the gun in his right hand. I saw that I couldn't get away so I ran in and clinched with him. I threw my arms around him so that I could protect myself. He stuck the barrel of the gun against my stomach and shot me. I think he shot me twice, but don't know. When he came out of the door with his hand on his gun he came towards me and I thought he was going to kill me. When Scott come out of the door he said something, but I don't know what he said. I was too much excited. After I slapped him in the kitchen I did not strike or threaten him again. When he come out of the door with the gun I thought that couldn't put him out and had to clinch with him to protect myself."

The phase of the altercation, as touched upon briefly in the dying declaration, is, to some extent, borne out by the testimony of other witnesses. It appears from the testimony of Alice Miller that a second altercation took place at the bar in the front part of the building. She says in her testimony, in answer to interrogatories propounded by the prosecuting attorney (referring to Scott):

"Ben—excuse my language—I says, 'Ben, the son of a bitch is going for his gun,' and so Ben went right after him, and he caught a hold of him, I judge just within about four feet of the bar, and at the same time five or six

fellows rushed up and grabbed Mr. Swago again, and pulled him away from Mr. Scott, and held him you might say in a vise."

Later in the same statement she said:

"Some one got a hold of Mr. Swago's arm, and I says, 'Come on then, let us get out of here quick,' and I went right out the front door, and Mr. Swago right after me, and he had gotten, I would judge, eighteen feet away from the house, and I walked straight out and walked off to the left, and I says, 'Ben, come on, let us make a run, for he is going to get you sure'; and he says, 'just wait a minute.' And I stood there and looked back of the house, and it kind of looked to me like he was studying, and I says: 'Don't stand there. Come on, let us go.' And just then Mr. Scott made a run right out of the door, and, as he stepped off of the porch, there was a sort of little step in front of the saloon, and as he stepped off of the porch, and he came out, with his hand in his right-hand overcoat pocket, with the gun in his hand, and I holloed to Ben again. 'There is a gun, look out!' And he ran to him, and he threw his left hand at Mr. Scott's right hand."

At another place in her testimony, referring to the altercation in the rear of the room, she said:

"And I grabbed a hold of Mr. Swago, and I stood there with my arm around him, and, as soon as Mr. Scott was released from these fellows that were holding him, he turn right around there, and he started right this way.

"Q. Scott did? A. Yes, sir; and at that time was when I told Mr. Swago to get him, that he was going for his gun, and I would judge about there, in fact almost in front of the door, is where Mr. Swago got him again, that is, got a hold of him, and he held him, and there were four or five fellows interfered again, and took Mr. Swago away from him, that was away from Mr. Scott, that is from fighting. Then I ran again into Mr. Swago right here, and I caught a hold of his right arm, and I says: 'Come on, Ben; let us get out of here. He is going to get you.' And at the same time Mr. Scott had already come

behind the bar up to this end, and he was standing right there when I was asking Mr. Swago to leave the house.

"Q. State whether or not that is where the defendant was when you and Swago left the house? A. He was— he was standing right there with both hands underneath the bar."

Referring to the immediate incident of the shooting outside the door of the saloon, the witness Miller further states:

"I told him to 'look out, there was the gun again.'

"Q. Tell—tell then what the two men did. A. Then Mr. Swago rushed into him, and he took his right hand, that is with his left hand and grabbed for the gun—right for the gun, and the first shot went off immediately after they came together, and the next shot followed very shortly, and I saw Mr. Scott's hand come down the next time."

At another place she testified:

"Q. Now will you illustrate and give the position of the two men when the shot was fired? A. Yes, sir (indicating). Mr. Swago was standing like this with both of his hands in his pocket.

"Q. That was before he started towards Mr. Scott? A. Yes, sir.

"Q. Yes. A. Just standing sort of a loose attitude of this kind, and as Mr. Scott came out the door, and I holloed to Mr. Swago to 'look out, there was the gun,' Mr. Swago started to pull his hands out of his pockets, and started right towards Mr. Scott, and Mr. Scott had a gun in his hand. I don't think he stepped over two or three steps, and Mr. Swago threw his left hand up, up to Mr. Scott to get the gun, he come out with in his right hand.

"Q. Who did? A. Mr. Swago. He grabbed the gun, and then the shot went off, just as the first shot went off, and the second shot followed immediately afterwards."

On cross-examination, the witness, being interrogated as to the movements of herself and the deceased after they left the front door of the saloon, testified as follows:

"Q. Why did you and Swago separate when you got outside of the saloon in front of the saloon? A. Because I was trying to make him come around and get behind the saloon and get away, and he would not do it. He stood off right out from the saloon."

The witness Miller was the principal witness for the state, and her testimony, taken in connection with the dying declaration introduced in evidence, discloses three events happening in succession, in each one of which the deceased appears to have been the aggressor.

[1-3] The plea of the defendant in this case being that of self-defense, the court gave several instructions bearing upon the law of self-defense in the abstract, and especial objection is raised by appellant herein to instruction No. 31, given by the court at the request of the state. It is as follows:

"You are instructed that it is not necessary for the state to prove that the defendant did not kill Ben Swago in necessary self-defense.

"Self-defense is an affirmative defense, and before you can acquit the defendant on that ground it must appear from the evidence in the case sufficient to raise in your minds a reasonable doubt that the killing of the deceased, at the time and place alleged in the indictment, if he was so killed, was not in necessary self-defense.

"If you find from the evidence beyond a reasonable doubt, that the defendant, at the time and place and in the manner alleged in the indictment, killed Ben Swago, named in the indictment, and if you further find that there is no evidence that the defendant, at the time he did so, acted under the influence of fear that his own life was in danger or that he was in danger of receiving great bodily harm from said Ben Swago, and that the killing of said Ben Swago was absolutely necessary to prevent it, then you must find the defendant guilty."

The second paragraph of this instruction contains a positive misstatement of the law. Sheared of all qualifying statements it reads: Self-defense is an affirmative defense, and before you can acquit the defendant on that

ground it must appear that the killing of the deceased was not in necessary self-defense. It requires no discussion of the law of self-defense to determine that this assertion, as given to the jury as an instruction of law applicable to the plea interposed by the defendant, was a clear misstatement of the law. It might be contended that this was a clerical error; but in cases of this kind, where a court seeks to instruct the jury on matters of law, if a clear misstatement of a legal principle appears, the fact that it is a clerical error will not relieve the injuries that might accrue therefrom. It might be contended that by other instructions given by the court the law was correctly stated. This court, as well as other courts, has repeatedly held that where a record in a criminal case shows that the court differently defined the law upon any given subject, one clause being correct, the other erroneous, that injury must be presumed to follow from such a state of facts, unless the record clearly shows that no injury resulted therefrom.

[4] The evidence in this case, in our judgment, is not sufficient in itself to support the verdict of murder in the first degree. The testimony of the state's witnesses, of whom the witness Miller was the principal witness, discloses that the deceased, Swago, was the assailant in the first instance. Whatever the acts or conduct of the defendant might have been, they were not, in our judgment, sufficient to warrant the assault of Swago in the first altercation, which took place in the rear of the room. It is manifest from the evidence that the witness Miller, the consort of the deceased, was not an impartial bystander on the occasion of this trouble. Her testimony relative to her utterances before the shooting indicates that, being encouraged more or less by the woman, he was a least a willing participant in the successive altercations. She says: " 'Ben, the son of a bitch is going for his gun,' and so Ben went right after him."

Referring again to this incident, she says: "And at that time was when I told Mr. Swago to get him, that he was going for his gun, and I would judge about there, in

fact, almost in front of the door, is where Mr. Swago got him again."

While the defendant had the opportunity to shoot deceased when the latter approached him, he did not do so. The shots were not fired until after the deceased had grappled defendant and the struggle had commenced.

[5] The evidence in this case pointing as it does to a less degree of guilt than that of murder in the first degree, it is manifest that the jury was led by something other than the evidence to render a verdict of first degree.

The second paragraph of the instruction No. 31 is a clear misstatement of the law applicable to self-defense, and, in view of the fact that the court instructed the jury "the jury must receive as law what is laid down as such by the court," the natural presumption becomes conclusive that the jury did consider the erroneous instruction. Whether this instruction in its form as given either misled the jury in arriving at the verdict, or confused them as to what the law really was, is immaterial; but either condition was prejudicial to the defendant in this case.

As was said by this court, speaking through Mr. Chief Justice Lewis, in the case of *State* v. *McGinnis,* 5 Nev. 337: "We are not fully satisfied that it misled the jury. Very serious doubts may be entertained as to that. Still, in a criminal case, any ambiguity which may have a tendency to mislead the jury should entitle the prisoner to a new trial."

As said by Mr. Justice Hawley, speaking for this court in the case of *State* v. *Ferguson:* "The law does not conclude the rights of individuals or parties upon any such uncertain grounds. Its utmost effort is accuracy, as far as it may be attained through fallible agencies, and then its mission is complete and its conclusions irrevocable." (*State* v. *Ferguson,* 9 Nev. 114.)

[6] The third paragraph of instruction No. 31 is objectionable inasmuch as it instructs that, unless the killing appeared to the jury to be absolutely necessary,

they must find the defendant guilty. An instruction very similar to this was dealt with in the case of *State* v. *Ferguson, supra,* and in that case Mr. Justice Hawley quoted approvingly from *State* v. *Collins,* 32 Iowa, 39, to the effect:

"The inquiry is not whether the harm apprehended was actually intended by the assailant, but was it actual and real to the accused as a reasonable man as compared with danger remote or contingent. By the frequent use of the words 'absolutely necessary,' as found in the instructions and charge, the jurors may have drawn the inference that before they would be justified in acquitting the defendant it must appear to them that the killing of deceased was absolutely necessary. This view of the case would virtually deprive a defendant of a reasonable exercise of his own judgment in determining from all the circumstances what was necessary to be done for the protection of his person or his life—a right which the law confers upon every individual, but one that must always be exercised at his peril, subject to revision by a jury of his peers."

To the same effect and following a strong line of decisions is the case of *Hawkins* v. *U. S.,* 3 Okl. Cr. 651, 108 Pac. 561.

The case of *State* v. *Ferguson, supra,* was quoted from at length and approvingly by Mr. Justice Ross, speaking for the United States Circuit Court of Appeals of the Ninth Circuit of the United States, in the case of *Owens* v. *U. S.,* and the rule as announced in the case of *State* v. *Ferguson,* in our judgment, is the proper rule applicable to the instruction in question.

The inquiry for the jury is: Did the defendant, acting as a reasonable man, upon the appearances of the existing conditions at the time of the encounter, believe at that time that it was necessary for him to commit that act in order to protect himself? An instruction upon the rule of self-defense which failed to set forth the above qualification is clearly erroneous. Whatever might be

said as to the court clearly setting forth the rule in other instructions, this error in instruction No. 31 could not be cured thereby. (*State* v. *Vaughan*, 22 Nev. 285, 39 Pac. 733; *Owens* v. *U. S.*, 130 Fed. 279, 64 C. C. A. 525.)

Appellant assigns as error the remarks of the trial court in the presence of the jury, on the admission of the dying declaration. As appears from the record, the dying declaration was offered by the state, through the witness Dr. Kitchen, who it appears was the physician in attendance upon the deceased and in whose presence the dying statement was made. In interposing his objection to the offer, counsel for appellant requested that the jury should retire while the matter was being presented to the court, to which suggestion the court said:

"The Court—What do you mean? Do you desire to make an argument?

"Mr. Percy—In regard to the admission of this statement; yes, sir. It is a purely legal question.

"The Court—I cannot see how that can affect the jury in that case.

"Mr. Percy—Well, if the court so desires. They have already heard the testimony concerning it. We submit to your honor's ruling then, and we will submit to your honor the law."

At the conclusion of a prolonged argument, the court in the presence of the jury made the following remarks:

"The Court—The admissibility of these dying declarations lies in the exception to the hearsay rule, and it is based solely on the question of necessity, the necessity of preserving evidence, which would otherwise become a loss through the death of the declarant before having time to get his testimony into court.

"There are two conditions which are absent from a dying declaration, which are present when a witness is giving his testimony in court. That is, the declarant is not under a solemn oath before a justice, and the second condition is the defendant does not have the opportunity to cross-examine the declarant upon the testimony that he has given in the dying declaration. Consequently, the

law having seen the necessity of the admission of dying
declarations in a case of homicide has, as a matter of
necessity, dispensed with the cross-examination, and the
law has laid down the rule that when a declarant is under
the fear of death, and in the presence of imminent death,
and realizes that his death is imminent, that such a situa-
tion as that creates in the mind of the declarant, who
realizes that he is about to go before his Maker, an obli-
gation which is as binding as an oath administered in a
court of justice. But the cross-examination, as a matter
of course, is always absent, and consequently the courts
do not admit these dying declarations unless the founda-
tion is clearly laid that the declarant was under and in
the presence of immediate dissolution, that he realized
that he had no hopes of recovery, and that he realized
that death was imminent.

"Of course, as to what is the meaning of imminent
death varies under the circumstances of every case. I
know in some cases dying declarations have been admitted
when the declarant did not die for six weeks or two
months after the making of the statement, but the foun-
dation was so clearly laid that at the time he made the
statement, he was under and in the presence of impend-
ing death, and that the court deemed the foundation
sufficient.

"Now in this case, considering all of the circumstances
which have been placed in evidence before the court, from
which the court must draw his conclusion as to whether
the declarant was under and in the presence of immediate
dissolution, and in the presence of impending death, and
had no hopes of recovery, I have come to the conclusion
that the foundation laid has been sufficient. I draw
it from all of the circumstances related by the doctor
here; and I draw it from the statement made by the
deceased immediately after, or shortly after, he received
the wound, and the statement made to the witness
Mitchell who testified here when he came up to him he
was lying on his back, and he stated, 'I am killed.' It is
evident at that time that he thought that death was

approaching. I draw it from the character of the wound which the doctor has described, the wound made by the bullet which penetrated almost the entire body of the declarant; from the location of the wound, and the organs which it penetrated; and from the fact that the declarant did die shortly after he made the statement, within about thirty hours; and further from the statement of the declarant himself. He had received a violent wound, a wound which was sufficient to prostrate him upon the ground on his back, and from which he was unable to rise until assisted, and, when assistance came to him, immediately the declarant stated that he was killed, and afterwards following it up by the statement testified to by the doctor, that he was done for, and that he could not get well.

"Mr. Hardy—Will your honor receive a little testimony before passing upon the question finally?

"The Court—I thought it had been submitted to me.

"Mr. Hardy—I would like to put on another witness.

"The Court—That is hardly the proper way to do, to wait until the court has indicated its decision, and then ask to offer further testimony. I do not think counsel can lie back and speculate on what the decision of the court is going to be, and then ask to offer further testimony afterward.

"Mr. Hardy—That is not the purpose of this. I did not know that your honor was going to render a decision at this time.

"The Court—It was submitted to me.

"Mr. Hardy—I did not want to interrupt the court, until I found it was evident you were deciding the question.

"The Court—The court would naturally conclude after the argument had been made that the matter was submitted. Do you desire to reopen the matter?

"Mr. Hardy—No, sir.

"The Court—I will say, if you insist upon it I will permit you to open up the matter again."

Thereafter the defendant, calling the witness Robert

Ernst to. testify relative to the acts and utterances of the deceased prior to the taking of the dying statement, of which the following proceedings took place:  .

"Mr. Hardy (attorney for appellant)—Q. Well, did he say anything to you about whether he expected to live or die? A. Well, he told me that he expected to die.

"Q. Well, did he say anything about what he proposed to do. A. He said if he lived——

"Mr. Callahan—I object to that as incompetent, I object to it as being incompetent, irrelevant, and immaterial, and too remote, and having no bearing upon the admissibility of the statement.

"The Court—I doubt very much as to the admissibility of this statement. I think I will exclude the jury for a few minutes."

At that time the court excluded the jury from the courtroom, and further hearing of testimony offered by the defendant, through the witness Ernst, was taken on the subject.

[7–8] The preliminary proof necessary. to establish the predicate for the admission of a dying declaration is submitted to the court, and, where request is made that that question be determined in the absence of the jury, the request should be granted. If the preliminary evidence is produced in the presence of the jury and the court fails to admit the same, irreparable injury may be wrought to the defendant. (*Westbrook* v. *People,* 126 Ill. 81, 18 N. E. 304; *People* v. *White,* 251 Ill. 75, 95 N. E. 1036; *Hawkins* v. *U. S.,* 3 Okl. Cr. 651, 108 Pac. 561.)

The Supreme Court of Oklahoma, in passing upon this question in the case of *Hawkins* v. *U. S., supra,* remarked: "If such proof is made and is sufficient, then the jury should be recalled, and both the preliminary evidence and the declaration should be given before them. If the preliminary proof is not sufficient, neither the declaration nor any part of the preliminary evidence, unless the latter is competent for some other purpose, should be given to the jury."

It is not the province of the court to determine that

a dying declaration has been made, but only that the preliminary evidence warrants the submission of that question to the jury. If the preliminary evidence clearly shows that the proposed declaration was not made in accordance with the rules rendering such a declaration admissible, it is, of course, the duty of the court to decide that the preliminary evidence offered is insufficient to warrant its submission to the jury. If there is a substantial conflict in the evidence, the court should submit the whole matter to the jury under proper instructions. It is the province of the jury to finally determine from the evidence whether a dying declaration has in fact been made and the weight it is entitled to.

[9] In considering the statements made by the court relative to the admissibility of the dying declaration, three questions present themselves:

First—Was the statement made by the court in the presence and hearing of the jury of the nature of an instruction as to the law applicable to a phase of the case? If so, not being in writing, was it error for the court to so instruct?

Second—Was the statement made by the court on the question of the admission of the dying declaration an erroneous statement of the law applicable to the subject?

Third—Were the utterances of the court in ruling upon the admission of the dying statement prejudicial to the defendant, in view of the fact that the utterances themselves were argumentative in their nature and tended to influence the jury on a question of fact to be decided by them, namely, the belief of declarant at the time he made the declaration that he was *in extremis?*

It might be unnecessary to dwell upon the last two questions, if the first one be decided in the affirmative.

In the case of *People* v. *Bonds,* 1 Nev. 33, this court in dealing with the proposition where the trial judge, in refusing to give certain instructions, said in the presence of the jury: "This idea of an accident, which has been urged by the defense, amounts to nothing, and is not tenable. There is no evidence to show it was an accident;

on the contrary it shows there was a scuffle, and that the defendant persisted in holding on to the pistol."

These remarks were addressed to counsel and not to the jury, but were in the presence and hearing of the jury. Mr. Justice Beatty, in speaking for this court with reference to the error, said: "There is nothing in the point made by the respondent's counsel that this was not a formal instruction, but merely a remark made to counsel. Such a remark made by the presiding judge in the hearing of the jury would have precisely the same effect as if given as a formal instruction."

As was said in the case of *State* v. *Harkin,* 7 Nev. 377: "It is difficult to give to these remarks any pertinency whatever, without regarding them as an oral instruction to the jury; and, so considered, the fact that they were not reduced to writing would constitute of itself ample ground for a reversal." (*People* v. *Bonds,* 1 Nev. 33; *State* v. *Tickel,* 13 Nev. 511; *State* v. *Warren,* 18 Nev. 459, 5 Pac. 134; *Allen* v. *U. S.,* 115 Fed. 10, 52 C. C. A. 597.)

In ruling upon the admissibility of the dying declaration, the expressions of the court, made in the presence of the jury, were entirely uncalled for. The sole question before the court on that occasion was as to whether or not the foundation had been laid for the admissibility of the dying statement, as an evidentiary element in proving the case of the prosecution. The weight of the dying declaration, after such had been admitted, was for the jury solely. Moreover, it was for the jury to determine the fact as to whether or not the dying declaration was made by the declarant while he believed himself to be in *articulo mortis.* (21 Cyc. pp. 986, 987; *Hawkins* v. *U. S.,* 3 Okl. Cr. 651, 108 Pac. 561; *People* v. *White,* 251 Ill. 75, 95 N. E. 1036.)

[10] The court's remarks relative to the admissibility of the dying declaration was an incomplete and erroneous statement of the law, and especially is this true with reference to his assertion wherein he states: "Consequently the law having seen the necessity of the admission of

dying declarations in a case of homicide has, as a matter of necessity, dispensed with the cross-examination, and the law has laid down the rule that when a declarant is under the fear of death, and in the presence of imminent death, and realizes that his death is imminent, that such a situation as that creates in the mind of the declarant, who realizes that he is about to. go before his Maker, an obligation which is as binding as an oath administered in a court of justice."

Mr. Wharton, in his work on Criminal Evidence (section 276), in speaking of this subject, says:

"In dealing with this kind of evidence, it should be observed that passions and prejudices, which in life may pervert the perceptive faculties, do not always lose their power on the deathbed; hence it cannot always be said that the consciousness of the near approach of death is equivalent to an oath administered on the witness stand. A witness sworn in court knows that he may be convicted of perjury if he testifies falsely. A dying man, if he believes in future retribution, will speak, if his faculties are unimpaired, under a similar sanction; but dying men do not always retain their faculties unimpaired, nor do all dying men believe in a future state of retribution. Convicts on the scaffold have as little hope of reprieve as persons on the eve of death; yet there is no kind of evidence as unreliable as the last speeches of convicts on the scaffold.

"Again, there is an absence of the cross-examination, the means by which, when a witness is produced in court, mistaken perceptions are corrected and delusions dispelled. Again, the witnesses who catch up these statements are generally friends of and sympathizers with the dying man eager to encourage and to preserve any remarks he may utter, no matter how incoherent or feverish, which may vindicate him, implicate the common object of hate; nor by such witnesses is it likely that questions would be asked as to the grounds of the declarant's belief.

"The weight, therefore, to be attached to dying

declarations depends upon these conditions: (1) The trustworthiness of the reporters; (2) the capacity of the declarant at the time to remember accurately the past; and (3) his disposition truly to tell what he remembers."

In the case of *State* v. *Eddon,* 8 Wash. 292, 36 Pac. 139, the Supreme Court of the State of Washington quoted approvingly from the case of the *State* v. *Vansant,* 80 Mo. 67, saying:

"It is to be remembered, however, in weighing such testimony, that the feelings of animosity and ill-will, once aroused, are not always allayed, and that the passion of anger attending the fatal occurrence itself is not always extinguished even by the consciousness of impending death; and it is also to be remembered that the accused is deprived of all power of cross-examination—a power quite as essential to the eliciting of all the truth as the obligation of an oath can be. Besides, such declarations are afflicted with the common infirmity which attaches to all oral statements or verbal admissions reduced to writing or repeated by another, and are liable to be colored or deflected by the medium through which they are transmitted to the jury."

The effect of the remarks of the trial court in this case, made in his ruling upon the admissibility of the dying statement, was necessarily to emphasize that statement and to make it appear to the jury that the statement itself, when submitted, was to have the same weight and consideration as though it had been made in their presence under oath. A dying declaration made by one who in truth believes himself to be *in extremis* does not, under the great weight of authority, receive the same weight and credence, nor is it to be judged by the same rule, as the testimony of living witnesses under oath and produced in court and subjected to cross-examination. (Wharton, Criminal Evidence, 10th ed., vol. 1, p. 540; *State* v. *McCanon,* 51 Mo. 160; *State* v. *Valencia,* 140 Pac. 1119.)

[11] The question whether the alleged dying declarations were made under such circumstances as to render

them admissible in evidence was in the first instance to be determined by the court upon the preliminary proof or. predicate for their admission. All that was required to let the statements go to the jury was the making of a *prima facie* case that the utterances were made by the declarant when he was *in extremis*, and when he was fully conscious of that condition. However this may be, the ultimate fact and the weight, credence, and significance to be given to the statement when admitted is for the jury, and it is error to remove this question from their consideration. (*People* v. *Thomson,* 145 Cal. 717, 79 Pac. 435; *State* v. *Hendricks,* 172 Mo. 654, 73 S. W. 194; 21 Cyc. 987.)

It was not within the province of the court to determine this fact for the jury, and it was especially erroneous for the court to argue this fact before the jury, or in their presence or hearing. Notwithstanding this, the court in ruling upon the objection said: "Now in this case, considering all of the circumstances which have been placed in evidence before the court, from which the court must draw his conclusions as to whether the declarant was under and in the presence of immediate dissolution, and in the presence of impending death, and had no hope of recovery, I have come to the conclusion that the foundation laid has been sufficient."

Following this the court repeated in the presence of the jury all of the conditions submitted in evidence, and the circumstances surrounding the taking of the statement and the utterances of the declarant. Had the court stood before the jury box at the conclusion of the trial and argued in behalf of the prosecution, he could not have presented a more forceful argument on this material phase of the case than that delivered to counsel in the presence of the jury, wherein he states his conclusions.

That juries listen with eagerness to the words and utterances of the trial judge, to glean from him his conclusions on the matter pending, is a fact not to be disputed, and it was that fact, as much as any other thing, that caused the framers of our constitution to set forth

that: "Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." (Article 6, sec. 12.)

"It is evident," said Mr. Justice Garber, in speaking for this court, "that the opinion of the court can be as effectively conveyed to the jury by expressing it in their hearing while ruling upon an objection to evidence, as by embodying it in what purports to be a declaration of the law of their instruction. Accordingly—and we think correctly—it has been held that the judge has no more right to volunteer, before the jury, his opinion upon a material fact in controversy, while deciding a question of law on the trial, than he has to charge the jury in respect of such fact. (*McMinn* v. *Whelan*, 27 Cal. 319; *State* v. *Dick*, 60 N. C. 47.) The right to a decision on the facts, by a jury uninfluenced and unbiased by the opinion of the judge, has been deemed worthy of a constitutional guaranty. It cannot be lawfully denied, by the simple evasion of looking at the counsel instead of at the jury, or of foisting the opinion into a ruling upon testimony." (*State* v. *Harkin*, 7 Nev. 383.)

The record discloses that the dying declaration was admitted in evidence by the trial judge after he had made the statement herein set forth. The record further discloses that no other instruction was given to the jury in any wise bearing upon the dying declaration as admitted.

From the statement of the trial judge made in their presence the jury must have concluded, and in fact could have reached no other conclusion, than that it was for the judge and not for them to determine as to whether or not the deceased, at the time of making the declaration, actually believed himself to be *in extremis*. No other conclusion could have been arrived at by the jury than that the statement itself as passed upon by the judge and admitted to the jury was a self-evident and conclusive fact that all of the statements which it contained were true. This was an erroneous impression which must necessarily have followed from the extensive remarks of the trial court.

Without passing upon the question as to whether or not such an impression could have been cured at all, it is sufficient to say that no attempt was made to cure it, or to give the jury a correct instruction bearing upon the subject.

Other alleged errors have been referred to in the arguments and briefs, but we think it unnecessary to refer to them. In some of the assignments of error it is claimed upon the part of the state that proper exceptions were not taken. Were it not for the fact that the jury found the defendant guilty of first degree murder upon evidence which, considering it in the most favorable light for the prosecution, can hardly be said to warrant a conviction for that degree of homicide, we might be inclined to regard technicalities with a greater degree of strictness, where defendant's substantial rights are involved. We would, we think, be justified in basing a reversal of this case upon the sole ground that the evidence does not justify the verdict of first degree murder; but, when the evidence is considered in connection with the errors committed at the trial, whether properly excepted to or not, the reason is all the stronger for basing a reversal upon the whole record of the case.

[12] We think it here proper to state that it is commendable for district attorneys to be vigorous in the prosecution of crime, but they should not forget that their duty is not solely to convict. The defendant has rights which the prosecuting attorney is as much bound to respect, and even protect, as he is bound fairly, vigorously, and justly to present the cause of the state at the trial. The right to life and liberty is one of the dearest and most precious things which a citizen possesses. While a citizen may, by a criminal act by him committed, forfeit his right to the one or the other, the state, whose representative the district attorney is, does not demand a conviction for a crime, or a particular degree of crime, as the case may be, where the facts do not warrant such a conviction. The office of district attorney is one of great power and responsibility. It may often happen

that he is called upon to protect the rights of an accused person from the possibility of a conviction based upon public sentiment rather than the actual facts of the case. When a prosecuting officer seeks to take advantage of public sentiment to gain an unjust conviction or seeks to take an unfair advantage in the introduction of evidence or in any other respect, he is failing in his duty as the state's representative. The duty of district attorneys to be fair to defendants on trial is scarcely less obligatory than the duty which rests upon the courts, whose officers they are. Both are bound, while holding a defendant accountable for his acts, to protect him in his substantial rights.

These observations are general and are not intended to be in criticism of the prosecuting attorney in this case, but as a gentle reminder to prosecuting attorneys generally of the nature and character of the office which for the time being they happen to fill. This court in a number of cases has been compelled to reverse convictions due to acts of overzealous prosecuting attorneys, and the reports of other courts show numerous reversals for the same reason. Hence an occasional reminder to prosecuting attorneys of what is the real character and function of their office may not be inappropriate.

The judgment and order refusing a new trial are reversed, and the cause remanded for a new trial.

It is so ordered.

NORCROSS, J.: I concur.

TALBOT, C. J., dissenting:

I am unable to agree with the conclusions of my learned associates regarding either the facts or the law pertaining to this case.

At the outset, I must dissent from any assertion that the deceased was the assailant in all the altercations, and particularly from the statements in the prevailing opinion that: "The record in this case discloses evidence produced by the state, depicting the circumstances of three distinct altercations occurring in succession between the deceased

and the defendant, in each of which the state's evidence undeniedly shows the deceased to have been the aggressor." "The witness Miller was the principal witness for the state, and her testimony, taken in connection with the dying declaration introduced in evidence, discloses three events happening in succession, in each one of which the deceased appears to have been the aggressor." "The testimony of the state's witnesses, of whom the witness Miller was the principal witness, discloses that the deceased, Swago, was the assailant in the first instance."

Unless I am without a proper understanding of the words used, there is no evidence to support these assertions, and if the evidence was conflicting, it was for the jury and is not for this court to determine. The Standard Dictionary defines "aggressor":

"One who commits an aggression, especially that one of two contestants who begins the quarrel; assailant, one who assails or attacks; assail, to attack or assault violently or with hostility, either with physical force or by argument, censure, abuse, or the like."

Webster defines "aggress":

"To commit the first act of hostility or offense; to begin a quarrel or controversy; to make an attack."

Webster in part defines "assailant":

"One that makes an assault; one that assails or attacks; (4) assail, to attack morally with a view to produce changes in the feelings, character, conduct; * * * to attack by words, hostile influence, * * * as to assail one with appeals, arguments, abuse, ridicule. 'They assailed him with keen invective; they assailed him with still keener irony.' (Macauley.)"

The evidence shows clearly that the defendant was to blame in starting the trouble by using his tool, and in ending it by shooting the deceased with a pistol. First of all, he committed a highly indecent act upon the floor, and the deceased being a partner in the establishment, who could properly feel ashamed and injured in business by such act of the deceased, simply and not improperly, asked him why he did it. The defendant being stimulated by liquor, abusive and domineering, continuing in

the wrong, assailed the deceased with most indecent language and threatened to put him out of the place. Then the deceased, acting upon an impulse created by the abuse of defendant, slapped the defendent, when, after further assault and altercation, and after they had been separated and held apart, the deceased left the room, and the defendant, notwithstanding effort to prevent him, went behind the bar, obtained a pistol, and followed the deceased after he had gone out of the building.

One man may assail another with abuse and threats, as the defendant did here, or spit in another's face, or commit acts by which he would be quite as much to blame as if he had been the first to give a blow. I am not aware that it is, or heretofore has been, the law that one who by using vile epithets and threats angers another so that he strikes with his fist is justified in killing the man that he wrongly caused to strike him; or that if the man who first used his fist, whether rightfully or wrongfully, has gone away to escape further trouble, the other can go and get a gun and pursue him and kill him when he tries to wrest the gun to protect himself, without being guilty of murder.

Under the dying declaration and the testimony of eye-witnesses, the jury were fully justified in concluding that the defendant obtained the gun, pursued the deceased after he had retreated, with malice and the intention of killing him, and that when the defendant was so pursuing and about to assault the deceased he, in an effort to save his own life, properly grappled with the defendant and endeavored to turn or wrest the revolver from him so as to avoid being shot.

When a person accused of crime pleads not guilty and goes to trial, he has the right of trial by jury guaranteed him by the constitution, and should be bound by the verdict of the jury when the verdict is supported by evidence showing guilt, regardless of any conflicting testimony. If there be a verdict of not guilty, it is conclusive against the state, however wrong it may be, and the accused cannot be tried again. All reasonable safeguards should be accorded to every person charged with crime; but when

he has counsel, is confronted by the witnesses, may produce evidence on his behalf, and the state must satisfy every one of twelve good men that he is guilty beyond a reasonable doubt, the verdict should not be lightly set aside. Heretofore this court has invariably held that it will not disturb the verdict of a jury if there is substantial evidence to support it. (*State* v. *Buralli,* 27 Nev. 41, 71 Pac. 532; *State* v. *Wong Fun,* 22 Nev. 336, 40 Pac. 95; *State* v. *Mills,* 12 Nev. 403.)

The statute (Rev. Laws, sec. 6386) provides that: "All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which shall be committed in the perpetration" of specified crimes, "shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree; and the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict whether it be murder of the first or second degree."

The jurors were the judges of the questions of fact, including the one as to whether the defendant was acting under impulse or with deliberate intent to kill when he insisted on obtaining the pistol and pursued the deceased after he had left the building to avoid trouble, and shot and killed the deceased after he grappled with the defendant in an effort to wrest the pistol and save himself from being shot.

Regarding the admission of the dying declaration and the remarks of the court made in relation thereto, I am unable to see that there is any prejudicial error. If there are any cases in which the jury need be excluded at the discretion of the court, they are rare. Seldom, if ever, can evidence as to whether deceased was aware of impending death at the time he made the dying declaration be of such a nature as to prejudice the jury against the defendant, whether the court consider such evidence sufficient and admit the declaration, or consider it insufficient and refuse to allow the declaration of the deceased to be

proven before the jury. What possible difference could
it have made in this case if the trial court had followed
such a rule as is now proposed by a majority of this court
and had frittered away its time by first excluding the jury
and hearing the evidence showing that the deceased was
aware of impending death at the time he made the dying
declaration, and the evidence had again been introduced
after the jury had been returned into court? If, as in
the present case, the jurors were given the evidence in
relation to the dying declaration, how could it have made
any difference with their verdict if the evidence had been
heard by the court in their absence first? The testimony
and the conditions show conclusively that the deceased
was aware of his impending death, and the circumstances
are such that it cannot be assumed that either the court
or jury would have found otherwise.

' The quarrel and shooting occurred late on the night of
February 24, 1913. The bullet entered his abdominal
cavity, about four inches to the left of the navel, and
ranged upward and backward. The wound prostrated
him upon his back upon the ground, and he was unable
to arise until assisted. He immediately said he was
killed, and afterwards told the doctor that he was "done
for" and could not get well. His principal dying declara-
tion was made the day after the shooting, and he died
the following day. In this statement he said, "I am an
awful sick man and might die before night." His dying
condition was so apparent to the attending physician and
others that it must be assumed, in connection with the
statements he made, that he was aware of his approach-
ing death. It is claimed that the deceased's declaration,
"I am an awful sick man and might die before night,"
indicated that he was not without hope of recovery. In
view of other statements made by him, and his fatal
condition, which must have been apparent to him as well
as to others, it appears that he was without hope of
recovery; that the statement quoted indicated no hope
of recovery, but rather doubt as to whether he would
live until night. The dying declarations were properly

admitted. (*State* v. *Williams*, 28 Nev. 395, 82 Pac. 353; *State* v. *Roberts*, 28 Nev. 350, 82 Pac. 100; *State* v. *Vaughan*, 22 Nev, 285, 39 Pac. 733; *State* v. *Murphy*, 9 Nev. 394; *State* v. *Hennessy*, 29 Nev. 320, 90 Pac. 221, 13 Ann. Cas. 1122). Nor was the admission of evidence that the deceased was without hope of recovery at the time the declaration was made, or the statements of the court regarding the admission of this evidence, whether made in the presence or absence of the jury, prejudicial error.

If in the presence of the jury the court did hear evidence regarding the state of mind of the deceased at the time he made the declaration, and found that evidence to be sufficient to lay the foundation for the admission of the declaration, what possible bearing or prejudice could such testimony have had upon the mind of the jury in determining whether the defendant was guilty of murder? How could the defendant be harmed by the statements of the judge in ruling upon a matter of law regarding his conclusions as to the condition of mind of the deceased when he made the dying declaration? If the court found and stated that the deceased was or was not aware of impending death, this would not have any tendency to prejudice or prove to the jury that the defendant was guilty. The constitutional provision that "judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law" (Const. art. 6, sec. 12), should apply to the dying declarations. (*State* v. *Buralli*, 27 Nev. 41, 71 Pac. 532.) If he proceeded further and stated as facts matters which were not conceded, this would not be prejudicial error unless there was something in his statement which might lead the jury to believe that the accused was guilty. If the judge had stated the contents of the dying declaration, including some matter which tended to show guilt of the defendant, and excluded the declaration on the ground that there was no proper foundation for the admission, it would have been error. There was nothing in the statements of the judge to indicate to the jury that

he believed or that they were to accept the statements in the dying declaration as true. He reviewed the facts showing that the deceased was aware of impending death, and stated that he concluded that they laid a sufficient foundation for the admission of the dying declaration. He did not tell the jury that they were to be bound by or accept his statements or conclusions in relation to the dying statement. On the contrary, they were told that they were the judges of the facts. If the judge had heard the evidence in the absence of the jurors, and admitted without comment the dying declaration on their return into court, the mere fact of such admission would have indicated to them that the judge was satisfied that the declaration was made under the sense of impending death.

Under the above section of our constitution and practice the judge is prevented from charging the jury regarding matters of fact, but this applies only to material undisputed questions of fact; and if the judge makes a statement regarding any question of fact which is disputed, and such fact, even if declared by the judge, would not have any tendency to show guilt or prejudice the defendant, such statement by the judge must be regarded as harmless. If it be admitted that the statement of the judge that the sense of impending death was equivalent to an oath was error, although some courts have so held, such statement might tend to add weight to the dying declaration or tend to convince the jury that it was true, if the evidence without the dying declaration did not show conclusively the facts indicating the commission of the crime. But what harm could this statement of the judge do the defendant if the material facts stated in the declaration were shown beyond dispute by other evidence upon which the jury would have acted with the same result if the declaration had not been admitted, and when it is evident that under the circumstances no court and no jury could have found otherwise than that the deceased was aware that he was about to die at the time he made the declaration? If the district judge had stated

his conclusion regarding some fact which was in dispute, and which tended to show the guilt of the defendant or was material to a determination of the case, and regarding which the jury might have found a different verdict if the statement had not been made by the judge, it would have been serious error.

Even the case of *Hawkins* v. *U. S.*, 3 Okl. Cr. 656, 108 Pac. 563, which of the two isolated ones cited seems to be mainly relied upon by my learned associates, a decision by an early Oklahoma criminal court, is not an authority for reversing this case on the ground that the court heard evidence regarding the state of mind of the deceased at the time he made the declaration. In that case the court said: "As a matter of practice it is much better to require the state to make the full preliminary proof necessary to establish the competency and admissibility of the dying declaration in the absence of the jury and before the declaration is given in their hearing; but where that is not done, and a consideration of all the evidence in the case shows the dying declaration to be competent and admissible, the error, if any, will be treated as harmless."

This means that the court there, contrary to the views of many other courts of last resort, believed it to be the better practice upon the trial to first hear such evidence in the absence of the jury; but if the court did not exclude the jury, and the evidence shows the declaration to be admissible, as it was in this case, "the error, if any, will be treated as harmless."

In *Rex* v. *John*, 1 East P. C. 357, it was held that where a dying declaration is offered in evidence it ought not to be left to the jury to say whether the deceased thought she was dying or not, for that must be decided by the judge before he receives the evidence.

In *Roten* v. *State*, 31 Fla. 514, 12 South. 910, it was held that the question as to whether dying declarations were made under the sense of impending death was one of law to be decided by the court, and that the accused had the right to have the decision of the court directly upon the

point, and that it was error for the court to avoid the decision and shift the responsibility upon the jury.

In *State* v. *Burns*, 33 Mo. 483, the defendant requested an instruction that if the jury believed that the dying declarations of the deceased were not made *in extremis*, and not at a time or under circumstances when the deceased was impressed with the conviction of death resulting from the illness with which he was then confined, then the jury should discard such . declarations, although they believed the evidence in respect thereto to be true.    It was held that the instruction was very properly refused, for it left it to the jury to pass upon the admissibility of the declarations, a question solely for the consideration of the court, and not for the jury.

In *State* v. *Simon*, 50 Mo. 370, it was held that the truth of the facts put in evidence to show that the declarations were made in view of speedy death is a matter exclusively for the court to determine.

In *People* v. *Kraft*, 148 N. Y. 631, 43 N. E. 80, affirming 91 Hun, 474, 36 N. Y. Supp. 1034, it was held that whether the circumstances under which an ante-mortem statement was made constituted sufficient foundation for its reception is a question which the trial court, upon the facts addressed to it, must draw and decide, and an issue with which the jury had nothing to do.

In *Justice* v. *State*, 99 Ala. 180, 13 South. 658, it was held that the question as to whether the declarant was convinced that he was *in extremis* was one regarding which the jury could not consider the credibility of the primary facts, and was one which must be determined by, and was within the exclusive province of, the court.

Mr. Bishop, the most accurate of all American text-writers on criminal law, over the citation of many authorities, states: "The court, not the jury, determines the admissibility of the dying declaration, the same as of other evidence, itself finding the necessary facts upon testimony laid before it." (Bishop's New Crim. Proc. 2d ed. sec. 1212.)

In the note under the heading, "Questions for Court or Jury," 56 L. R. A., pages 434 to 441, inclusive, many cases are reviewed. In the first paragraph of this note, and near the end, it is said:

"It is generally conceded that the preliminary question as to whether the party offering in evidence the statements of deceased in a trial for homicide has laid a proper foundation for their admission is, primarily, for the judge or court presiding at the trial. And in England and nearly all the states it is held that the decision of the court or judge on this subject is final and conclusive; and that with it the jury have nothing to do. There are a few stray decisions in some of the states to the general effect that after the court has admitted the declarations in evidence the jury have a right to pass upon the question as to whether the declarant was under a sense of imminent, impending dissolution and without hope of recovery; but in most instances they will be found to be weak *dicta,* or to have been overruled.    *    *    *

"The following are cases to the effect that the general rule is as herein stated, viz, that the question is absolutely one for the court to decide, and which the jury have no right to pass upon: *Moore* v. *State,* 12 Ala. 764, 46 Am. Dec. 276; *Faire* v. *State,* 58 Ala. 74; *Richard* v. *State,* 42 Fla. 528, 29 South. 413; *State* v. *Baldwin,* 79 Iowa, 714, 45 N.W. 297; *State* v. *Kuhn,* 117 Iowa, 216, 90 N.W. 733; *State* v. *Trivas,* 32 La. Ann. 1086, 36 Am. Rep. 293; *State* v. *Molisse,* 36 La. Ann. 920; *State* v. *Cantieny,* 34 Minn. 1, 24 N.W. 458; *State* v. *Johnson,* 76 Mo. 121; *State* v. *Johnson,* 118 Mo. 491, 24 S.W. 229, 40 Am. St. Rep. 405; *State* v. *Reed,* 137 Mo. 125, 38 S.W. 574; *State* v. *Sexton,* 147 Mo. 89, 48 S.W. 452; *Basye* v. *State,* 45 Neb. 261, 63 N.W. 811; *Maine* v. *People,* 9 Hun (N.Y.) 113; *People* v. *Anderson,* 2 Wheeler Cr. Cas. (N.Y.) 390; *State* v. *Shaffer,* 23 Or. 555, 32 Pac. 545; *Kehoe* v. *Com.,* 85 Pa. 127; *Com.* v. *Sullivan,* 13 Phila. (Pa.) 410; *State* v. *Quick,* 15 Rich. (S. C.) 342."

In addition to the instructions considered in the opinion, objections were made to a number of others, which were

copied from the statute. Illustrative of these is No. 23, which is the same as section 6402 of the Revised Laws, and which is as follows:

"If a person kill another in self-defense, it must appear that the danger was so urgent and pressing, that in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given."

It was urged that this instruction nullifies the doctrine of reasonable belief of appearances to the comprehension of the defendant at the time of the killing, and bases the right of self-defense entirely upon absolute necessity, ignoring what might have appeared to the defendant as a reasonable person, and that it is an unqualified declaration by the court that the right of self-defense to the extent of taking life exists only when the killing is absolutely necessary. At the request of the defendant the court gave the following instruction (No. 28):

"I instruct you that, in order for the defendant to be justified and excused on the ground of self-defense, it is not essential that there should be any actual or real danger of his receiving great bodily harm. If there be an appearance of danger caused by the act or demonstrations of such person, and if such acts or demonstrations, or such words, coupled with acts or demonstrations, produce in the mind of the defendant, as a reasonable man, a reasonable expectation of some great bodily injury to himself, the defendant will be justified and should be acquitted if he in good faith acts on such appearance of danger and under such reasonable expectation or fear, even though it afterward turns out that there was, actually and in reality, no danger."

Taking the two instructions together, the jury was sufficiently directed as to the matter in regard to which this exception is taken. Considering the words in No. 23 that "it must appear that the danger is so urgent and

pressing," that instruction is not in conflict with No. 28, or the part thereof relating to the appearance of danger; nor should No. 23 and the other instructions, which are copied from the statute, be held erroneous, whether considered singly or in connection with other instructions.

The second paragraph of instruction No. 31, stating that "Self-defense is an affirmative defense, and before you can acquit the defendant on that ground it must appear from the evidence in the case sufficient to raise in your minds a reasonable doubt that the killing of the deceased at the time and place alleged in the indictment, if he was so killed, was not necessary in self-defense"—if susceptible of the construction placed upon it in the opinion, would simply indicate that the insertion of the word "not" in the last line was a clerical mistake, and that the jurors, who must be presumed to have at least ordinary intelligence, would not have been misled into the belief that it was not necessary to show that the killing was in self-defense in order for them to acquit the defendant, when there can be no doubt that every juror must have known the contrary. However, in the attempt in the opinion to construe the meaning of this instruction, the words "a reasonable doubt that," which are modified by the word "not," are inappropriately omitted.

Instructions too favorable to the defendant should not be grounds for reversal; and, under the usual rules of practice, clerical errors are to be disregarded, and words which do not prejudice the defendant are not ground for reversal.

The statement in the opinion that "the third paragraph of instruction No. 31 is objectionable, inasmuch as it instructs that unless the killing appeared to the jury to be absolutely necessary they must find the defendant guilty," is identical with the statute, section 6402, which is the same as instruction No. 23, above quoted, which the last paragraph of instruction No. 31 correctly states.

In *State* v. *Ferguson*, 9 Nev. 106, upon which considerable reliance seems to be placed, the instructions which were criticized were different from the ones here, and contained matter which the legislature had not declared

to be the law.   The opinion was written  by a revered
member of this court, who afterwards became a great
jurist, at a time when he had little experience as a
lawyer or judge.

It is a well-established rule of practice that, in
determining whether an instruction is erroneous or cal-
culated to mislead the jury, the whole charge must be
taken together and considered as an entirety, and, if.
anything essential omitted from an instruction be found
in another portion of the charge, the omission will not be
fatal.   (*State* v. *Pritchard,* 15 Nev. 74; *Allison* v. *Hagan,*
12 Nev. 38; *State* v. *Raymond,* 11 Nev. 98; *State* v.
*Donovan,* 10 Nev. 36; *Solen* v. *V. & T. R. R. Co.,* 13
Nev. 106.)

The court should not be expected to give all the law in
one instruction.   If instruction No. 31 did not contain all
that the defendant desired, his counsel was at· liberty
to request the giving of a further instruction, which was
done.   If it had been incumbent on the court to give
instructions on behalf of the defendant, instruction No.
28 contains the very matter which it is claimed is the
correct principle of law omitted from instruction No. 31.
If considered together, as it must be presumed they were
by the jury, they correctly state the law, and no harm:
resulted to the defendant.

If trial courts may not give to juries instructions in the
exact language of the statute, or parts of the statute,
defining murder, or the crime for which the accused is on
trial, leaving him to offer other instructions which are the
law as he may desire, the procedure of prosecuting officers
and district courts may be rendered uncertain, needless
new trials or setting aside of verdicts, trouble for wit-
nesses and jurors, expense to taxpayers, and impairment
of the administration of justice and the safety of society
may result.   The court should follow its properly author-
ized power to construe the laws, and not, by legislating
words out of the statute which were clearly placed there
for a purpose, usurp the prerogatives of the lawmaking
power, which belong to another branch of the government.

It is strongly urged that the court erred in not giving

an instruction defining manslaughter. On behalf of the state it is said that the court did define manslaughter in different instructions. As often indicated by this court, it is not incumbent upon the trial judge to prepare and give instructions on behalf of the defendant, who may draw and request the giving of such instructions as he may desire. (*State* v. *St. Clair*, 16 Nev. 207; *State* v. *Davis*, 14 Nev. 407.) To sustain the contention that it was prejudicial error for the trial court to fail to fully instruct regarding manslaughter, or on other matters regarding which no instruction was requested, would not only reverse numerous decisions of this court, but would make a radical change in the practice and promulgate a new rule which would require the exercise of unusual care and impose upon the trial judge the labor and detail work which should be borne by counsel in numerous cases, and lead to unnecessary reversals.

Among the sixty-three specifications of error, a number of others relate to matters which may arise upon a new trial, and are of sufficient importance to be given consideration. Objection was made to the allowance by the court of an answer by one of the witnesses who was asked if he had heard the defendant make any threats against Ben Swago, and who had replied that the defendant had said a short time prior to the homicide, "To hell with the Slavonians!" The jury had the right to consider whether this statement was intended to apply to the deceased. If, as counsel contends, it had no reference to him, it was not of such a prejudicial character as to be reversible error. It is admissible to prove threats, motive, hatred, or ill-will, expressed by the accused against the deceased in homicide cases. (*State* v. *Hymer*, 15 Nev. 49; *State* v. *Bonds*, 2 Nev. 265.)

Upon cross-examination the district attorney asked one of the defendant's witnesses regarding the conduct and affecting the reputation of his sister, objections to which were sustained by the court. Although it is generally better for the district attorney not to ask questions regarding matters which are not properly admissible in

evidence, I am unable to see that the mere asking of these questions constitutes error warranting the reversal of the case. Some courts have required witnesses upon cross-examination to answer the most searching questions regarding their personal character, tending to humiliate and degrade, which did not pertain directly to their truth and veracity. In some jurisdictions the extent of these questions is left largely to the discretion of the court. Nevada is among the states in which the witness is not required to answer interrogatories not relating to convictions of felony which merely tend to degrade and do not bear upon his truth and veracity. Professor Wigmore, in his work on Evidence, has treated extensively the right of cross-examination in this regard. (Volume 2, secs. 987, 988.)

Our statute provides: "A witness shall answer questions legal and pertinent to the matter in issue, though his answer may establish a claim against himself; but he need not give an answer which will have a tendency to subject him to punishment for a felony, nor need give an answer which will have a direct tendency to degrade his character, unless it be to the very fact in issue, or to a fact from which the fact in issue would be presumed. But a witness shall answer as to the fact of his previous conviction of felony." (Rev. Laws, sec. 5437.)

This section of the civil practice act is made applicable to criminal cases. (Rev. Laws, secs. 7451, 7454.)

In *Maxwell* v. *Rives*, 11 Nev. 214, it was held that the witness might put himself upon his privilege not to criminate or degrade himself, but as he expressly disclaimed this excuse he was bound to answer the questions.

In *State* v. *Huff*, 11 Nev. 28, it is said: "The witness may be privileged from answering; but the question may be put, and, if the witness waive his privilege, answered, if the answer relates to the conduct of the witness and legitimately affects his credit for veracity. We think this rule was violated in this case in allowing an examination in regard to matters not legitimately affecting the veracity of the witness. No legitimate inference of the

untruthfulness of a witness can be drawn from the fact that he has been convicted of frequent assaults and batteries. It could be inferred that he was a violent-tempered and perhaps a dangerous man, but not that he was a liar. See 1 Greenl. Ev. sec. 458, to the effect that questions are not permissible, 'the answers to which, though they may disgrace the witness in other respects, yet will not affect the credit due to his testimony.' "

In *State* v. *Larkin*, 11 Nev. 330, it is said in the opinion: · "A witness may be unchaste and yet be truthful. A witness may be chaste and yet be untruthful. The law affords ample remedies for testing the credibility of witnesses, without introducing testimony of specific acts of immorality, and in particular instances allows greater latitude than in others, owing to the special facts and circumstances that surround each individual case. There are perhaps exceptional cases where it might be proper to show the utter depravity of the moral character of a witness in order to establish the fact that such a witness is not entitled to any credit. But we are not dealing. with the exceptions. The general rule, as recognized by a majority of the decided cases, is that evidence of bad character for chastity, where such character is collater-ally, not directly, in issue, is not admissible for the purpose of impeaching the credibility of a witness. (*People* v. *Yslas*, 27 Cal. 630; *Gilchrist* v. *McKee*, 4 Watts, 380, 28 Am. Dec. 721; *Jackson* v. *Lewis*, 13 Johns. 505; *Bakeman* v. *Rose*, 14 Wend. 110; *Ford* v. *Jones*, 62 Barb. 484; *Spears* v. *Forrest*, 15 Vt. 436; *Kilburn* v. *Mullen*, 22 Iowa, 502; *Rudsdill* v. *Slingerland*, 18 Minn. 381.) * * *

"A man may be so incontinent as to destroy his reputation for chastity, and yet retain a scrupulous regard for truth. Want of chastity, in many instances, might include a want of veracity; but it must be admitted that this is not always so. It is only with the witness's character for truth and veracity with which the jury have to deal. A witness, although unchaste, is entitled to credit if the jury are convinced that his, or her, testimony is true. A witness, although chaste, is not

entitled to credit if the jury are convinced that his, or her, testimony is false. 'The only object of inquiring into the character of a witness,' as was said in *Rudsdill* v. *Slingerland*, 'is to ascertain whether his statements in themselves are entitled to credit; if he is a truthful person, they are; otherwise, they are not. A witness therefore, in coming into court, would, perhaps, properly be considered as asserting his character for truthfulness to be good, and be charged with notice to defend it; but we are unable to see why a witness should be held responsible to answer for, or be required to meet, an attack upon his character in any other respect. A man may indulge in vices which destroy his general character, yet his truthfulness, and his reputation for truthfulness, may be unimpeachable. An inquiry in such a case as to his moral character would mislead, instead of assist, in arriving at the object of investigation, namely, his credibility; it would, in any event, be an unnecessary attack and exposure of him to contempt and disgrace. Further, by such general inquiry as to character, the administration of justice would be hindered and delayed by collateral issues, and be more easily made the channel of venting private hatred and malice. For these, among other reasons, we think the better general rule is that, in impeaching the character of a witness in this mode, the inquiry in chief must be restricted to his credibility; that is, his general reputation for truth and veracity."

This cross-examination of the district attorney of the witness relating to the conduct of his sister, who was a witness for the state, bears no similarity to the statement of the district attorney in *State* v. *Rodriguez*, 31 Nev. 342, 102 Pac. 863, relied upon by appellant, that defendant was a maque, when there was no evidence in the case to support the assertion.

The defendant asked for a new trial by reason of newly discovered evidence, which is not a ground for a new trial under the statute. The affidavits presented would not be considered as requiring a new trial under the practice relating to civil cases. If the criminal practice act allowed

new trials on the ground of newly discovered evidence, they would not be available on the part of the state after a verdict of acquittal, under the constitutional provision against an accused person being twice put in jeopardy. If new trials were allowed on that ground, the ultimate punishment of criminals might in many cases become uncertain. Persons under conviction and entitled to relief by reason of newly discovered evidence may apply for pardon.

The practice, so long followed in this court, that errors not specified and excepted to will not be considered on appeal, should not be overturned, because not fair to the trial court, to opposing counsel, or to litigants. (Wigmore on Evidence, sec. 20; *McGurn* v. *McInnis,* 24 Nev. 370, 55 Pac. 304, 56 Pac. 94; *Finnigan* v. *Ulmer,* 31 Nev. 523, 104 Pac. 17; *State* v. *Williams,* 31 Nev. 360, 102 Pac. 974; *State* v. *Jones,* 7 Nev. 408; *State* v. *Mangara,* 33 Nev. 511, 112 Pac. 693; *State* v. *Clark,* 36 Nev. 472, 135 Pac. 1083; *Lightle* v. *Berning,* 15 Nev. 389; *Sharon* v. *Minnock,* 6 Nev. 377; *State* v. *Murphy,* 9 Nev. 394; *Dick* v. *Bird,* 14 Nev. 161.)

Recent decisions in this court holding that errors that do not prejudice should be disregarded are: *State* v. *Clark,* 36 Nev. 472, 135 Pac. 1083; *State* v. *Mircovich,* 35 Nev. 489, 130 Pac. 766.

In the Mircovich case we said:

"The Revised Laws provide at section 7302 that, 'After hearing the appeal, the court shall give judgment without regard to technical error or defect which does not affect the substantial rights of the parties,' and at section 7469 that 'no judgment shall be set aside, or new trial granted, in any case on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right.' These provisions have been slightly modified or broadened by the new code,

but are substantially similar to the one passed at the first session of the territorial legislature and in force for more than fifty years; and they are nearly the same as the one more recently recommended by the American Bar Association. (Stats. 1861, p. 499, sec. 589; Comp. Laws, sec. 4554.)

"This court has often applied this statute in murder and other cases, and refused to set aside convictions or remand actions for new trials for errors which did not affect the substantial rights of the accused. (*State* v. *Williams,* 31 Nev. 360, 102 Pac. 974; *State* v. *Jackman,* 31 Nev. 511, 104 Pac. 13; *State* v. *Skinner,* 32 Nev. 70, 104 Pac. 223; *State* v. *Simpson,* 32 Nev. 138, 104 Pac. 244, Ann. Cas. 1912c, 115; *State* v. *Petty,* 32 Nev. 384, 108 Pac. 934, Ann. Cas. 1912d, 223; *State* v. *Martel,* 32 Nev. 395, 108 Pac. 1097; *State* v. *Depoister,* 21 Nev. 107, 25 Pac. 1000; *State* v. *Vaughan,* 22 Nev. 285, 39 Pac. 733; *State* v. *Hartley,* 22 Nev. 342, 40 Pac. 372, 28 L. R. A. 33; *S. N. M. Co.* v. *Holmes M. Co.,* 27 Nev. 107, 73 Pac. 759, 103 Am. St. Rep. 759).

"In *State* v. *Buster,* 23 Nev. 348, 47 Pac. 194, it was held that the failure of the trial court to make the proper order striking out the testimony of a witness concerning a confession was harmless error, because the same confession was conclusively established by several other witnesses whose testimony was not contradicted. As the evidence was clear and undisputed that Mircovich killed Gregovich by stabbing him with a knife, in the presence of numerous people, at the railroad station, the jury could not have found otherwise, regardless of whether testimony relating to a confession or statements concerning the knife were properly or improperly admitted."

No prejudicial error, among the sixty-three claimed, is shown, and no good reason appears for this court to go contrary to its former decisions and those of other courts generally, and to the laws passed by the legislature, to relieve the defendant, who was convicted of murder after a fair trial and an energetic defense, when as a result he must either be turned loose on the community or great

expense be incurred by the county, and much time and trouble be imposed upon the district court, prosecuting officers, witnesses, and jurors by a new trial. Witnesses may have died or left the state, and for other reasons conviction may now be difficult, although warranted and obtained upon the original trial. If the punishment inflicted be deemed too severe, relief should be sought from the pardoning power, the one created to consider and act in such cases.

### ON PETITION FOR REHEARING

*Per Curiam:*

Rehearing denied. _____