IN THE MATTER OF THE APPLICATION OF CARL D. WHEELER FOR A WRIT OF HABEAS CORPUS.

No. 4983

October 19, 1965                    406 P.2d 713

*Carl F. Martillaro,* of Carson City, for Applicant.

*Harvey Dickerson,* Attorney General, Carson City; *William J. Raggio,* District Attorney, Reno, and *R. Gaynor Berry,* Deputy District Attorney, of Reno, for Respondent.

## OPINION

By the Court, Thompson, J.:

By application for habeas corpus to the district court, Carl Wheeler sought release on bail, pending his trial

for murder. The procedure is authorized by NRS 34.530. That court denied habeas relief and this appeal followed. NRS 34.380(3). We heard oral arguments eleven days before trial was to commence in the district court. Accordingly, we departed from normal practice and decided the appeal that day, September 17, 1965, affirming the order entered below. This opinion is in explanation of our ruling.

The appeal is mainly concerned with the quantum of proof needed to satisfy the constitutional standard for bail in a capital case. Nev. Const. art. 1, § 7, provides that "All persons shall be bailable by sufficient sureties; unless for Capital Offences when the proof is evident, or the presumption great." Using the quoted language conversely, the legislature has provided that "No person shall be admitted to bail where he is charged with an offense punishable with death when the proof is evident or the presumption great," NRS 178.025, and has invested the court with discretion to evaluate the proof "in all cases where the punishment is death," NRS 178.020. Here the murder prosecution was initiated by grand jury indictment. The proceedings before that body were secret (NRS 172.320–172.340; see also dictum Victoria v. Young, 80 Nev. 279, 392 P.2d 509) and not available for court evaluation on the habeas hearing for release on bail. Because of this fact the state offered some evidence to implicate the accused, which was not controverted. That evidence was the testimony of a police officer who related what is claimed to be the dying declaration of the deceased that Wheeler shot him without provocation. It was contended below, and here, that such evidence, standing alone, does not meet the constitutional standard of evident proof or great presumption. The foundation for the officer's testimony is questioned, and also the credit to be accorded the deceased's statement as related by the officer. We hold that the lower court, in the exercise of its discretion, could properly conclude that the constitutional standard was satisfied.

1. Our resolution of this appeal must begin with the obvious emphasis of the constitutional provision for bail.

Again the words are: "All persons shall be bailable by sufficient sureties; unless for Capital Offences when the proof is evident or the presumption great." Those words favor bail and are consonant with the presumption of innocence. State v. Konigsberg, 33 N.J. 367, 164 A.2d 740. The central thought is that punishment should follow conviction, not precede it. Accordingly, all offenses are bailable, including capital offenses, as a matter of right. That right is absolute in a non-capital case, but limited if a capital offense is involved. The limitation—"when the proof is evident or the presumption great." Within the area of limitation a court is invested with a judicial discretion to resolve the matter. Our view of the constitutional emphasis is contrary to certain expressions contained in earlier opinions of this court. For example, in Ex parte Malley, 50 Nev. 248, 256 P. 512, where the charge was embezzlement, the court said, "In a proceeding of this character the petitioner is presumed to be guilty of the offenses charged in the indictments." We now reject that statement as wholly incompatible with the presumption that an accused is innocent of the offense charged until proven guilty and convicted. Similarly do we reject as unsound any language in Ex parte Finlen, 20 Nev. 141, Ex parte Nagel, 41 Nev. 86, 167 P. 689, and State v. Teeter, 65 Nev. 584, 200 P.2d 657, indicating that an accused has the burden of showing that the proof of his guilt of a capital offense is not evident or the presumption thereof not great when applying for release on bail.[1] The burden rests upon the state to show that the right to bail is limited rather than absolute. State v. Konigsberg, supra; Ford v. Dilley, 174 Iowa 243, 156 N.W. 513; Ex parte Thrash, 167 Tex.Crim. 409, 320 S.W.2d 357.

To be sure, the limitation upon the right to bail is vaguely defined. A metes and bounds description of its scope is not possible. There are, however, significant guidelines. A prerequisite for limiting the right to bail is the commission of a capital offense—one which may be punishable by death. NRS 178.025; 178.020; 175.180.

[1] Cases on point are collected in the annotation, 89 A.L.R.2d 855.

An offense for which the death penalty is not proscribed does not fall within the delimiting language. Thus, in a homicide prosecution, only first degree murder (NRS 200.030(4)) is affected by the constitutional limitation. Lesser included offenses are not touched. Therefore the initial task of the court to which the habeas application is addressed is to examine the proof offered by the state and deduce therefrom whether the elements of a capital offense may exist. In discharging this task no weight may be given the pleading—the indictment or information—for it is not proof as contemplated by the constitution, nor does it create a presumption of guilt. Some competent evidence tending to prove the commission of a capital offense must be offered before the accused's right to bail may be limited.

In evaluating the amount of proof needed to defeat bail the lower court is granted broad discretion. Indeed, if its discretion is exercised in favor of the applicant and his release on bail is ordered, we may not review that ruling. It is not appealable. Only when bail is denied (or the amount fixed is excessive) may we entertain an appeal to review the lower court's exercise of discretion. Thus, the issue on review is always whether the lower court abused its discretion in denying bail. We think it apparent that, on a habeas hearing for release on bail, the state need not prove the accused's guilt beyond a reasonable doubt. That degree of proof is reserved for for trial and is not what the writers of our constitution had in mind in providing for bail. On the other hand, the state must produce enough evidence to satisfy the court that a capital offense has been committed by the defendant and that resolution of the habeas application falls within the area of its discretion. How much evidence is "enough evidence" must of necessity be resolved on a case by case basis. A fixed rule cannot be formulated.

Once that determination is made, other information unrelated to the guilt of the accused, but relevant to the

main purpose of bail—to encourage the accused's presence before the court when needed and particularly at trial—may be received to aid the court in finally resolving the matter. We say "information," (not proof, for it is not possible to prove whether the defendant will appear at a future time), and have in mind such matters as the prior criminal record of the accused, if any, attempted escapes from confinement, community associations, and employment opportunities, which may bear upon the probability of his presence before the court when needed.

It is within this context that we are to review the ruling below.

2. At the bail hearing the state presented the testimony of a Reno city police officer who had responded to a call that a shooting had occurred in an apartment on Yori Avenue. Upon arriving there he noticed a man, known to him as Chuck Hughes, lying on the kitchen floor. Hughes was bleeding profusely from a gaping chest wound. He appeared to be in extremis, and stated that he thought he was about to die.[2] He then briefly related the circumstances of the shooting. Hughes died twelve days later. The record shows an appropriate foundation

---

[2]The pertinent testimony:

"Q. Now, then, what happened after you made these observations that you have just related?

"A. After I entered the kitchen, and just general observations of what I have already said, I knelt down beside Hughes and I told him who I was. And he said, 'Yes, I know.'

"I asked him, I said, 'Chuck, do you think you are going to die?'

"And he says, 'Yes, I think I am. I hurt awfully bad.'

"And I asked him, I said, 'Who shot you?'

"He says, 'Wheeler.'

"And I says, 'You mean Carl Wheeler?'

"And he says, 'Yes.'

"And I asked him, 'Why did he shoot you?'

"And he says, 'I don't know.' He said, 'I just walked in the back door and he told me he had to kill me, and he started shooting.'

"And I asked him, 'Well, Chuck, did Wheeler know that you was coming over?'

"And he said, 'Yes. I had called him on the phone,' and he said, 'I walked in the back door, and he said, "I've got to kill you," and then he started shooting.'

"And I asked him again if he thought that he was going to die,

for the relation of Hughes' statement as a dying declaration, State v. Teeter, supra; Ex parte Nagel, supra; and, if accepted as wholly true, could supply the basis for a finding of the essential components of first degree murder. NRS 200.030(4). Of course, the weight or credit to be given that statement is for the jury at trial.

Before the lower court ruled, the prosecutor and defense counsel each made comment concerning the accused's prior criminal record and also referred to the fact that he was on bail from another state when the shooting at hand took place. This information was relevant to the issue before the court, and of value in deciding the matter. It is, of course, preferable that such information be presented by authenticated records (rather than by the prosecutor's comment) and marked as exhibits in evidence. This was not done. However, the failure to do so is of no moment here, for the information was conceded to be correct.

---

and he said, 'Yes, I think that I'm going to die.' He said, 'I hurt awfully bad.'

"Q. Did you inquire of Mr. Hughes as to whether he had any objects or guns in his hand?

"A. I asked him if he had a gun when he entered the house. And he said no. I asked him, I said, 'Well, did you make any motions as if you was going to harm Mr. Wheeler?' And he said no. He said, 'I was just looking for help.'

"Q. Now, did you have any further conversation with him relative to his condition before the ambulances came?

"A. Yes. I went back over these same questions with him three times. I talked to him about another crime that had occurred prior to his being shot there. And at one time just before the ambulance service arrived—well, he kept asking for water, and I told him that he could not have water. And he would try to move around, and I would try to keep him as still as possible until the ambulance arrived.

"And just before the arrival of the ambulance he kind of stiffened out and he asked me if I would hold his hand, he thought that—I think if I remember exactly the words, I think he said, 'I think this is it.' And I held his hand and wiped his face with this sweat towel that had been given to me in the presence of the other officers in the room at that time.

"When the ambulance service arrived, and as soon as they attempted to load him onto the guerney [sic], he became even more unconscious and he became even more white than he was before."

[Headnote 16]

The order below denying petitioner's application for release on bail is affirmed.

BADT, J., and ZENOFF, D. J., concur.