STANLEY WILSON, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 5959

April 23, 1970                              468 P.2d 346

*Franklin Rittenhouse* and *Foley, Garner & Shoemaker*, of Las Vegas, for Appellant.

*Harvey Dickerson*, Attorney General, *George E. Franklin, Jr.*, District Attorney, *George H. Spizzirri*, and *Larry C. Johns*, Deputy District Attorneys, Clark County, for Respondent.

## OPINION

By the Court, BATJER, J.:

At approximately 3:15 a.m., on December 8, 1967, Henry Feltus was struck with a blast from a shotgun. He died at approximately 4:30 a.m., that same morning. The appellant was accused of killing Feltus; tried before a jury; convicted of murder in the first degree; and sentenced to life imprisonment without the possibility of parole. This appeal is taken from that conviction.

During the early morning of December 8, 1967, Feltus was at Ruben's Supper Club in Las Vegas, Nevada. The appellant entered the establishment, approached Feltus and indicated he wanted to converse with him outside the premises.

At the trial, witnesses testified that they had observed the appellant and Feltus leave by the back door of Ruben's, and that within a matter of seconds they heard what was thought to be a gunshot. Cleveland Ramsey stated that shortly after he heard the gunshot he observed Feltus come back into the club through the back door. At that time Feltus was holding his side with his hand, blood was gushing out between his fingers, and his clothes were covered with blood from his chest to his feet. As Feltus made his way to the bar, Dorothy Mae Willings rushed to help him, and he said to her, "Oh, Baby, I've been shot," and fell to the floor near the bar. Ramsey testified that Feltus had a large hole in his right chest area. Vera Maxine Bullock, the wife of one of the co-owners of the club asked Feltus who had shot him. After he was given a drink of brandy Feltus answered that Stan had shot him. At approximately 3:30 a.m., Merlin John Dingle, an officer of the Las Vegas Police Department, arrived at the scene. The officer observed that Feltus, who was covered with blood from the top of his chest to his shoes, was moaning, gasping and thrashing around on the floor; that there were large quantities of blood pouring from a wound in his chest; and that it took three men to hold him down. Officer Dingle knelt down and stated, "Henry, this is Dingle. Who shot you?" Feltus responded, "Stan." This response was given two or three times. Officer Dingle then asked, "Do you mean Stanley Wilson?" The declarant nodded his head yes, and went "Um, hum."

Further attempts at conversation failed to evoke intelligible responses. Feltus died at 4:30 a.m., at the Southern Nevada Memorial Hospital. Dr. John C. Bovill testified that Feltus "[H]ad an obvious open massive wound of the right chest and you could see into the right chest, which is a little unusual." The doctor further testified that Feltus was conscious after he had arrived at the hospital and concluded that Feltus had the type of wound that frequently would cause death.

The trial court conducted a hearing, outside the presence of the jury, where the state's witnesses testified to facts surrounding the dying declaration of Feltus. After that hearing the trial court concluded that the declaration was made when Feltus was in extremis; that he was conscious of that condition, and that the state had laid a sufficient foundation for the presentation of the dying declarant's testimony. Ex parte Wheeler, 81 Nev. 495, 406 P.2d 713 (1965); State v. Teeter, 65 Nev. 584, 200 P.2d 657 (1948); State v. Scott, 37 Nev. 412, 142 P. 1053 (1914). Over the appellant's objection the

state's witnesses were then allowed to repeat the testimony before the jury.

The appellant contends that the trial court erred when it admitted such declarations into evidence. He further contends that the prosecutor committed reversible error when he asked one of the appellant's witnesses whether or not he had been convicted of a felony without having acceptable proof of that fact, and that an additional error was committed when the prosecutor, upon cross-examination of the appellant, asked a question which indicated that the appellant was a pimp.

The appellant conceded that the declarant was in extremis and realized that he was dying when he stated that the appellant had shot him. He further concedes that the trial court properly followed and applied the law of this state when it allowed testimony of the dying declaration before the jury, but he contends that the trial court erred when it did not require the prosecution to affirmatively prove, beyond a reasonable doubt, that the declarant believed in an Almighty Being and a life hereafter. The appellant insists that this requirement be added in this case because testimony was presented which tended to prove that the victim was a pimp.

The appellant is asking this court to establish an additional rule which would require the state to prove, through the introduction of affirmative evidence, that the presumption of truthfulness raised by the declarant's awareness of impending death is believable beyond a reasonable doubt. This we refuse to do. He misconceives the function of the court and jury. Once the trial judge reasonably finds, from the evidence, that there is a sufficient foundation to admit the dying declaration, then the statement is presented to the jury to be considered and weighed along with the credibility of the declarant.

As a general rule an accused, during the presentation of his defense is free to introduce whatever relevant evidence may be available to establish that the declarant was a person of dissolute and immoral character and in that manner discredit the dying declaration. Here the appellant did introduce testimony discrediting the victim, but because it was apparently discounted or disregarded by the jury, he asks us to impose upon the prosecution a burden of proof unheard of in the common law and unsupported by any authority, although he purports to rely on Barber v. Page, 390 U.S. 719 (1968).

It has long been the established law in this state that dying declarations are competent evidence for or against the accused, upon preliminary proof of certain existing conditions. In State v. Scott, 37 Nev. 412, at 429, 142 P. 1053, at 1059 (1914), this court said: "The question whether the alleged dying declarations were made under such circumstances as to render them admissible in evidence was in the first instance to be determined by the court upon the preliminary proof or predicate for their admission. All that was required to let the statements go to the jury was the making of a prima facie case that the utterances were made by the declarant when he was in extremis, and when he was fully conscious of that condition. However this may be, the ultimate facts and the weight, credence, and significance to be given to the statement when admitted is for the jury, and it is error to remove this question from their consideration. People v. Thomson, 145 Cal. 717, 79 P. 435; State v. Hendricks, 172 Mo. 654, 73 S.W. 194; 21 Cyc. 987."

In State v. Teeter, supra, a case where the facts were very similar to the case at hand, although the declarant lived for several days after he received the fatal wound, this court said: "The authorities, very generally, hold that for a court properly to conclude that the declarant making the statement believed death was impending, it is not necessary for the declarant to state to anyone, expressly, that he knows or believes he is going to die, or that death is certain or near, or to indulge in any like expression; . . . . It is sufficient if the wounds are of such a nature that the usual or probable effect upon the average person so injured would be mortal; and that such probable mortal effect is not hidden, but, from experience in like cases, it may be reasonably concluded that such probable effect has revealed itself upon the human consciousness of the wounded person, so that he knows, or strongly believes, that death impends. Wharton's Criminal Evidence, eleventh edition, sec. 530, pp. 852–854, and the many cases cited."

Fundamentally we are precluded by the Nevada Constitution, Art. 1, Sec. 4,[1] from adopting any rule that would

---

[1]Nevada Constitution, Art. 1, Sec. 4: "The free exercise and enjoyment of religious profession and worship without discrimination or preference shall forever be allowed in this State, and no person shall be rendered incompetent to be a witness on account of his opinions on matters of his religious belief, but the liberty of consciene [conscience] hereby secured, shall not be so construed, as to excuse acts of licentiousness or justify practices inconsistent with the peace, or safety of this State."

impinge upon the liberty of conscience and this applies equally to the dead as well as to the living.

In Barber v. Page, supra, cited by the appellant, the United States Supreme Court quotes with approval from Mattox v. United States, 156 U.S. 237, 242–243.

We quote with approval from a different part of that same case (Mattox v. United States, supra, 243–244): "The law in its wisdom declares that the rights of the public shall not be wholly sacrified in order that an incidental benefit may be preserved to the accused.

"We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a Bill of Rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried farther than is necessary to the just protection of the accused, and farther than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination; nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice. As was said by the Chief Justice when this case was here upon the first writ of error, (146 U.S. 140, 152,) the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath."

The High Court has clearly indicated that once the prosecution has clearly established that the declarant is in extremis and he is aware of that status, his statement is admissible, as an exception to the hearsay rule, to be considered by the jury. After the dying declaration has been presented to the jury, the

accused then has wide latitude in impeaching the declarant and discrediting his dying statement, but the ultimate fact and the weight, credence and significance to be given to the statement is for the jury.

We now turn to the appellant's contention that the prosecutor committed reversible error, first when he asked one of the appellant's witnesses if he had ever been convicted of a felony, to which the witness replied in the negative; secondly, when upon cross-examination one of his questions posed to the appellant inferred that the appellant was a pimp. When those questions were asked, during the trial, the appellant neither objected to them, nor moved to strike them from the record. The trial court was given no opportunity to rule on their propriety or admissibility. Neither question was so inherently unfair or damaging as to require the trial court to *sua sponte* preclude them.

When an appellant fails to specifically object to questions asked or testimony elicited during trial, but complains about them, in retrospect upon appeal, we do not consider his contention as a proper assignment of error. Wyatt v. State, 86 Nev. 294, 468 P.2d 338 (1970); Cross v. State, 85 Nev. 580, 460 P.2d 151 (1969); Cranford v. State, 76 Nev. 113, 349 P.2d 1051 (1960); State v. Ceja, 53 Nev. 272, 298 P. 658 (1931).

Appellant's counsel were appointed to prosecute this appeal. We direct the trial court to give each of them the certificate specified in NRS 7.260(3), to enable them to receive compensation for their services rendered on appeal.

The judgment of the trial court is affirmed.

COLLINS, C. J., ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.