OPINION
 

 By the Court,
 

 Becker, J.:
 

 Appellant Jerry Harkins shot Miles Deriso in the early morning of December 1, 2003. Deriso died shortly thereafter. A jury found Harkins guilty of first-degree murder with the use of a firearm. The district court sentenced Harkins to serve two consecutive terms of life imprisonment with the possibility of parole after twenty years has been served in each term.
 

 Harkins raises two primary arguments on appeal. First, he argues that a statement made by Deriso during a 911 telephone call prior to Deriso’s death was testimonial. Therefore, Harkins contends that the district court erred by not excluding the statement
 
 *977
 
 under
 
 Crawford v.
 
 Washington
 
 [1]
 
 because Deriso was unavailable to testify at trial and Harkins did not have a prior opportunity to cross-examine Deriso. Second, Harkins argues that the district court erred by failing to properly instruct the jury on self-defense based on apparent danger.
 
 [2]
 

 We first conclude that Deriso’s statement was a dying declaration and, as such, the statement’s admission did not violate Harkins’ Sixth Amendment right to confrontation as defined in
 
 Crawford.
 
 Dying declarations were recognized at common law as an exception to the right to confrontation, and that exception was not repudiated by the Sixth Amendment. We also take this opportunity to clarify the testimonial nature of statements made during a 911 emergency call. In so doing, we conclude that Deriso’s statement made during the 911 call is nontestimonial. Next, we conclude that, although the district court erred by giving an improper self-defense instruction based on apparent danger, the error was harmless beyond a reasonable doubt. Thus, we affirm Harkins’ conviction.
 

 FACTS
 

 Harkins’ stepson, Tylo,
 
 [3]
 
 was friends with Deriso’s son Brandon. In August 2003, Tylo telephoned Brandon, but Deriso answered. During their conversation, Deriso allegedly solicited Tylo to kill Brandon. After their conversation, Tylo told his mother about De-riso’s proposition; neither informed the police. However, Tylo’s mother informed Susan Deriso, Brandon’s mother and Deriso’s ex-wife, who said she would take care of it, but she also did not inform the police. Tylo and his mother also told Harkins about De-riso’s solicitation.
 

 Months later, Harkins ran into Deriso at the grocery store, and Deriso gave Harkins an open invitation to come to Deriso’s house for a drink. Around Thanksgiving, Harkins stopped by Deriso’s house. While talking, Deriso asked Harkins for some pain pills, which Harkins had because of back surgery. Harkins said he would have to think about it.
 

 A few days later, on the evening of November 30, 2003, Harkins had several family members at his house, and he was drinking.
 
 *978
 
 After dinner, Harkins went to his usual poker game where he drank more alcohol. Harkins returned home at approximately 12:30 a.m. on December 1, 2003. He then took several of his prescription medications, including Percocet, methadone, and Neu-rontin. Rather than going to sleep, Harkins decided to take some pain pills to Deriso.
 

 Harkins parked his van several blocks away from Deriso’s house, allegedly because he did not want anyone to be able to find him. He then walked to Deriso’s house, knocked on the door, and De-riso let Harkins in. The two discussed Deriso’s recent divorce, and Deriso became increasingly angry. Deriso also expressed anger about Tylo because Tylo had talked about Deriso’s solicitation of him to kill Brandon. Deriso then allegedly said that he would have to kill Tylo. Harkins said he was done listening and began to leave. According to Harkins, Deriso hit him, and the two fought, with Deriso slashing at Harkins with a knife. Harkins was able to get the knife away from Deriso and throw Deriso out of the way. Harkins left and walked to his van.
 

 While walking to his van, Harkins decided to return to talk to Deriso because he could not leave the situation as it was. Harkins retrieved a loaded .32 caliber revolver from his van, put on a latex glove, and started back to Deriso’s house. Harkins thought the gun would be enough to scare Deriso into not following through with his threat to kill Tylo. On his way to Deriso’s house, Harkins allegedly unloaded the gun, but reloaded it without thinking. At De-riso’s door, Harkins allegedly hid the gun underneath his shirt and then knocked on the door. Deriso let Harkins in.
 

 According to Harkins, Deriso immediately began attacking him. Harkins thought Deriso was stabbing him with a screwdriver or an ice pick. At one point, Deriso allegedly stabbed Harkins in the neck. The two fought some more. Then, according to Harkins, he fell backward and fired one shot from his gun while he was falling. When Harkins got up, Deriso was gone. Harkins left through the front door, dropping his gun in a trash can outside the house. An officer later dispatched to the scene found Harkins walking in the neighborhood with blood stains on his shirt. Harkins was transported to Washoe Medical Center where he was treated for minor lacerations on his neck, abdomen, left wrist, and left forearm— none of which were life-threatening wounds.
 

 After being shot, Deriso ran to his neighbor Wayne Whitton’s house. Whitton called 911. The dispatcher gave Whitton instructions on how to care for Deriso while waiting for the ambulance. Then,, the dispatcher asked Whitton if Deriso knew who shot him. Whitton relayed the question to Deriso. According to Whitton’s trial testimony, Deriso responded, “Jerry shot me and he was paid to do it.’ ’ Deriso died shortly thereafter.
 

 
 *979
 
 Before trial, Harkins filed a motion in limine to preclude Whit-ton from testifying about Deriso’s statement in response to the 911 dispatcher’s question. Counsel for Harkins argued that the statement was testimonial and, therefore, should be excluded under
 
 Crawford
 
 as a violation of Harkins’ right to confrontation. The State contended that as a statement made during a 911 emergency call, it was not testimonial and, therefore, was admissible under
 
 Crawford.
 
 The State also argued that Deriso’s statement was a dying declaration, which should be admitted as an exception to the confrontation right under the Sixth Amendment.
 

 The district court denied Harkins’ motion. In doing so, the district court found that the statement merited a high degree of trustworthiness and reliability, which the court concluded was the rationale for admitting dying declarations. The district court also indicated that the 911 call was made in an attempt to save Deriso’s life. Therefore, the district court concluded that under
 
 Crawford
 
 and the rule on dying declarations, the statement was admissible. Counsel for Harkins again objected during Whitton’s testimony regarding the statement, but the district court overruled the objection.
 

 At trial, Harkins asserted a theory of self-defense, on which the district court instructed the jury. The jury found Harkins guilty of first-degree murder with the use of a firearm.
 

 DISCUSSION
 

 Admissibility of Deriso’s statement made in response to the 911 dispatcher’s question
 

 Harkins contends that the district court erred by admitting De-riso’s statement — “Jerry shot me and he was paid to do it” — made in response to the 911 dispatcher’s question. We conclude that the district court did not err for two reasons. First, the statement was a dying declaration and, therefore, it is an exception to the confrontation protection afforded by the Sixth Amendment. Second, the statement is not testimonial and, therefore, admission of the statement did not violate Harkins’ Sixth Amendment confrontation right.
 

 As we have discussed in prior cases, the United States Supreme Court in
 
 Crawford
 
 concluded that “if a hearsay statement of an unavailable declarant is ‘testimonial’ in nature, the statement is admissible only if the defendant had prior opportunity to cross-examine the declarant concerning [the statement].”
 
 [4]
 
 In reaching this conclusion, the Court overturned
 
 Ohio v.
 
 Roberts
 
 [5]
 
 with regard
 
 *980
 
 to testimonial hearsay.
 
 [6]
 
 Since the Supreme Court decided
 
 Crawford,
 
 this court has addressed a number of
 
 Crawford-related
 
 issues. Here, we address two additional issues: (1) whether a dying declaration is an exception to the Sixth Amendment right to confrontation, and (2) whether statements made during a 911 emergency call are testimonial.
 

 As a dying declaration, Deriso’s statement is an exception to the protection afforded by the Confrontation Clause
 

 The district court found that Deriso’s statement was a dying declaration. We will not disturb this finding absent an abuse of discretion.
 
 [7]
 
 Under NRS 51.335, “[a] statement made by a declarant while believing that his death was imminent is not inadmissible under the hearsay rule if the declarant is unavailable as a witness.” The belief by the declarant in his impending death “may be inferred from circumstances such as the nature of the declarant’s wounds or injury.”
 
 [8]
 
 As we have stated, “If the declarant subjectively senses impending death without any hope of recovery, then there is present the vibrant requisite which the law demands to waive the solemnity of an oath and to receive the decedent’s testimony without cross examination.”
 
 [9]
 

 We conclude that the district court correctly found Deriso’s statement to be a dying declaration. When Deriso came through Whitton’s door, he immediately asked Whitton to call 911 because he had been shot. Whitton testified that Deriso appeared to be in pain. When Whitton relayed the 911 dispatcher’s question to De-riso of who shot him, Deriso was lying on the floor and he had trouble speaking. According to Whitton, when Deriso spoke, “he would come in and he would go out.” At the time Deriso made the statement at issue, he appeared to Whitton to be seriously injured and in serious distress. He lost consciousness soon after the ambulance arrived. Deriso died approximately an hour and a half later. Based on these facts, when Deriso stated, “Jerry shot me and he was paid to do it,’ ’ he likely believed his death was imminent. Therefore, the statement qualifies as a dying declaration.
 

 Admission of Deriso’s dying declaration did not violate Harkins’ Sixth Amendment right to confrontation even though Deriso was
 
 *981
 
 unavailable as a witness at trial and Harkins did not have a prior opportunity to cross-examine him. In analyzing the Confrontation Clause, the Supreme Court in
 
 Crawford
 
 relied heavily on the right of confrontation as it existed “at common law, admitting only those exceptions established at the time of the founding.”
 
 [10]
 
 The Court stated that “there is scant evidence that exceptions were invoked to admit
 
 testimonial
 
 statements against the accused in a
 
 criminal
 
 case.”
 
 [11]
 
 But the Court noted one possible exception recognized at common law — dying declarations:
 

 The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is
 
 sui generis.
 

 [12]
 

 Based on this comment by the Court and on the history of dying declarations, several state courts have adopted the view that the admission of dying declarations, including those that are testimonial, does not violate the Confrontation Clause.
 
 [13]
 
 As the California Supreme Court observed, “Dying declarations were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken.”
 
 [14]
 
 The common law permitted dying declarations so long as the declarant was conscious of his danger at the time of making the declaration.
 
 [15]
 
 According to the Supreme Court in 1895,
 

 The primary object of the [Confrontation Clause] was to prevent depositions or
 
 ex parte
 
 affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury ....
 
 [16]
 

 
 *982
 
 The Confrontation Clause, like other provisions in the Bill of Rights, is subject to exceptions, “recognized long before the adoption of the [Constitution, and not interfering at all with its spirit.”
 
 [17]
 
 A dying declaration is one such exception to the Confrontation Clause.
 

 [Dying declarations] are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination, nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility.
 
 [18]
 

 We agree with the states that recognize dying declarations as an exception to the Sixth Amendment confrontation right. With the Supreme Court’s statement that the Confrontation Clause “is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding,”
 
 [19]
 
 it follows that because dying declarations were recognized at common law as an exception to the right of confrontation, they should continue to be recognized as an exception. We therefore conclude that the district court did not err in admitting Deriso’s dying declaration.
 

 Because Deriso’s statement was not testimonial, the statement’s admission did not violate Crawford
 

 [Headnote 4]
 

 We further take this opportunity to address whether statements made in the context of a 911 emergency call are testimonial under
 
 Crawford.
 
 We conclude that Deriso’s statement was not testimonial and therefore admission of the statement did not violate
 
 Crawford.
 
 Deriso’s statement — “Jerry shot me and he was paid to do it”— was made in response to the 911 dispatcher’s question asking if Deriso knew who shot him.
 
 [20]
 
 In
 
 Crawford,
 
 the Supreme Court did
 
 *983
 
 not specifically adopt a definition of “testimonial,” but the Court concluded that some statements qualify as testimonial under any definition.
 
 [21]
 
 Among such statements are “[statements taken by police officers in the course of interrogations.”
 
 [22]
 
 The Court concluded that these statements “are . . . testimonial under even a narrow standard.’ ’
 
 [23]
 
 The standard that police interrogations produce testimonial statements applied easily to the facts of
 
 Crawford:
 
 the de-clarant was in police custody, had been given a
 
 Miranda
 
 warning, and had engaged in a tape-recorded conversation with police.
 
 [24]
 
 But the standard is not always easily applied.
 

 In the recent case of
 
 Davis v. Washington,
 
 and its companion case,
 
 Hammon v. Indiana,
 
 the Supreme Court more specifically addressed the dichotomy between testimonial and nontestimonial statements made during police interrogations.
 
 [25]
 
 The Court held,
 

 Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
 
 [26]
 

 The Court’s application of this rule to the facts of
 
 Davis
 
 and
 
 Ham-mon
 
 provides fiirther insight into the dichotomy between testimonial and nontestimonial statements.
 

 Davis
 
 involved a domestic disturbance between Michelle McCottry and her boyfriend, Adrian Davis. During a 911 call with McCottry, the 911 dispatcher ascertained that McCottry’s boyfriend was “jumpin’ on [her] again,” there were no weapons at the scene, the boyfriend was using his fists, and he had not been drinking. The 911 dispatcher then asked McCottry what her boyfriend’s name was. McCottry responded that it was Adrian
 
 *984
 
 Davis and stated, “He’s runnin’ now.” The dispatcher learned that Davis had ran out the door after hitting McCottry and that he was leaving in a car. At that point, the 911 dispatcher told McCottry, “Stop talking and answer my questions.” The dispatcher then gathered more information about Davis and his purpose for being at McCottry’s house. Police officers arrived soon thereafter.
 
 [27]
 

 At trial, the state’s only witnesses were the two police officers who responded to the 911 call. McCottry was unavailable to testify. The trial court also admitted a recording of the 911 call. Davis objected to admission of the recording based on the Confrontation Clause, but the court overruled the objection. The jury convicted Davis of violation of a domestic no-contact order. The Washington Court of Appeals affirmed. The Supreme Court of Washington also affirmed, concluding that the portion of. the 911 call in which McCottry identified Davis was not testimonial and that if other portions were testimonial, their admission was harmless beyond a reasonable doubt.
 
 [28]
 

 In analyzing the testimonial nature of McCottry’s statements to the 911 dispatcher, the United States Supreme Court concluded that ‘ ‘the circumstances of McCottry’s interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency.’ ’
 
 [29]
 
 The Court began with the general proposition that at least the initial interrogation conducted in a 911 call is “ordinarily not designed primarily to ‘establis[h] or prov[e]’ some past fact, but to describe current circumstances requiring police assistance.”
 
 [30]
 
 The Court then looked at several facts surrounding the circumstances of the 911 call.
 

 First, McCottry was describing events to the 911 dispatcher
 
 “as they were actually happening,
 
 rather than ‘describing] past events.’ ’ ’
 
 [31]
 
 In comparison, the interrogation in
 
 Crawford
 
 occurred several hours after the events described took place.
 
 [32]
 

 Second, “any reasonable listener would recognize that McCot-try (unlike Sylvia Crawford) was facing an ongoing emergency.’ ’
 
 [33]
 
 McCottry’s call was a call for help against a physical threat as opposed to providing a report of a crime absent imminent danger.
 
 [34]
 

 
 *985
 
 Third, when viewed objectively, the nature of the 911 dispatcher’s questions were such that McCottry’s responses were ‘ ‘necessary to be able to
 
 resolve
 
 the present emergency, rather than simply to learn (as in
 
 Crawford)
 
 what had happened in the past.”
 
 [35]
 
 Regarding the 911 dispatcher’s question to McCottry of her boyfriend’s name, the Court concluded even that information was necessary to attend to the emergency “so that the dispatched officers might know whether they would be encountering a violent felon.”
 
 [36]
 

 Fourth, the difference in the level of formality between McCottry’s interrogation and Crawford’s was substantial. “Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry’s frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.”
 
 [37]
 

 From the above facts, the Court concluded that the primary purpose of the interrogation was to assist in an ongoing emergency.
 
 [38]
 
 Additionally, the Court stated that McCottry “was not acting as a
 
 witness',
 
 she was not
 
 testifying.
 
 What she said was not ‘a weaker substitute for live testimony’ at trial.”
 
 [39]
 
 “No ‘witness’ goes into court to proclaim an emergency and seek help.”
 
 [40]
 

 The Court also noted that an interrogation that begins for the purpose of determining the need for emergency assistance can result in testimonial statements once that purpose has been achieved.
 
 [41]
 
 For example, once the 911 dispatcher gathered the necessary information from McCottry to address the emergency, McCottry’s later responses to the disptcher’s questions could be considered testimonial.
 
 [42]
 

 The Court reached the opposite conclusion, that the statements at issue were testimonial, in Davis’s companion case,
 
 Hammon.
 
 
 *986
 
 There, the Court concluded that statements were testimonial when made to an officer for purposes of taking an affidavit after a domestic-violence emergency had ended. While taking statements from Amy Hammon, the officer interrogated her in a separate room, away from her husband, Hershel.
 
 [43]
 
 This more formal interrogation was similar to that in
 
 Crawford.
 
 “Both declarants were actively separated from the defendant — officers forcibly prevented Hershel from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over.”
 
 [44]
 
 Conversely, in comparing
 
 Hammon
 
 to Davis, the Court noted that the declarant in
 
 Davis
 
 made her statements while in immediate danger and that she was describing events as they were happening in order to seek aid.
 
 [45]
 

 Together,
 
 Crawford, Davis,
 
 and
 
 Hammon
 
 demonstrate that when determining whether a statement is testimonial, it is necessary to look at the totality of the circumstances surrounding the statement. This conclusion is reflected in our
 
 post-Crawford
 
 precedent on the issue of what constitutes a testimonial statement.
 

 In
 
 Flores v. State,
 
 we concluded that a statement is testimonial if it “ * “would lead an
 
 objective witness
 
 reasonably to believe that the statement would be available for use at a later trial.” ’ ”
 
 [46]
 
 We then applied this “objective witness test” in
 
 Medina v. State
 
 where we examined the testimonial nature of statements made by a rape victim.
 
 [47]
 
 In
 
 Medina,
 
 we concluded that the victim’s spontaneous statements to her neighbor were nontestimonial but that statements made to a forensic nurse for the purpose of gathering evidence for possible use in a later prosecution were testimonial.
 
 [48]
 

 Recently, we addressed in
 
 Pantano v. State
 
 the issue of “whether a child-victim’s statements to a parent regarding a sexual assault constitute testimonial hearsay under . . .
 
 Crawford.”
 

 [49]
 

 We concluded that the child’s statements to her father were nontestimonial given the circumstances surrounding the father’s questioning of his
 
 *987
 
 daughter.
 
 [50]
 
 He was “inquiring into the health, safety, and well-being of the child,” not gathering evidence for purposes of litigation.
 
 [51]
 

 Based on United States Supreme Court and Nevada precedent addressing the issue of whether a hearsay statement is testimonial, it is abundantly clear that the inquiry requires examination of the totality of the circumstances surrounding the making of the statement. We have begun with a general rule: whether the statement would, under the circumstances of its making, “ ‘ “lead an
 
 objective witness
 
 reasonably to believe that the statement would be available for use at a later trial.” ’ ”
 
 [52]
 
 We now take the opportunity to further refine this rule by presenting a nonexhaustive list of factors for courts to consider in determining whether a statement is testimonial: (1) to whom the statement was made, a government agent or an acquaintance; (2) whether the statement was spontaneous, or made in response to a question (e.g., whether the statement was the product of a police interrogation); (3) whether the inquiry eliciting the statement was for the purpose of gathering evidence for possible use at a later trial, or whether it was to provide assistance in an emergency; and (4) whether the statement was made while an emergency was ongoing, or whether it was a recount of past events made in a more formal setting sometime after the exigency had ended. No one factor is necessarily dispositive, and no one factor carries more weight than another. These factors will assist courts in ascertaining the relevant facts surrounding the circumstances of a hearsay statement in order to determine its testimonial nature.
 

 By applying these factors to the instant case, we conclude that Deriso’s statement — “Jerry shot me and he was paid to do it”— was not testimonial. First, Deriso’s statement was made to an agent of the police (the 911 dispatcher).
 

 Second, the part of Deriso’s statement that “Jerry shot me” was in response to the dispatcher’s question of whether Deriso knew who shot him. However, the portion of the statement that “he was paid to do it” was additional spontaneous information not in response to the question.
 

 Third, the purpose of the inquiry was to address the ongoing emergency of Deriso’s severe injury and to ascertain the danger of the situation. Although the assailant’s name was not likely neces
 
 *988
 
 sary to assist Deriso medically, that information could be used by police to prevent further harm. Similarly, the information that “he was paid to do it’ ’ was not relevant in assisting Deriso medically, but that information could also be used by police to determine the extent of the danger at the scene, i.e., the seriousness of Harkins’ intent to kill Deriso and whether he might return to the scene to ensure the job was completed. And again, Deriso made that portion of the statement spontaneously, not in response to the dispatcher’s question.
 

 Fourth, the statement was made during an ongoing emergency. Although Harkins had run out the door of Deriso’s house, an objective witness in the same circumstances would not have known that, and Harkins could still have been a threat to Deriso or Whit-ton. There was no indication that Harkins left the area completely at that point. Further, Deriso made his statement only minutes after being shot while bleeding on Whitton’s floor, rather than in a more formal setting after the emergency had ended where he could calmly recount past events.
 

 Based on these facts, Deriso made his statement “in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency.”
 
 [53]
 
 Therefore, the statement is not testimonial, and its admission did not violate Harkins’ Sixth Amendment right to confrontation.
 
 [54]
 
 Thus, we conclude that the district court did not err.
 

 The district court’s error in its instruction on self-defense based on apparent danger was harmless beyond a reasonable doubt
 

 Next, Harkins argues that the district court erred in its jury instruction on self-defense based on apparent danger. A defendant has the right to have the jury instructed on a theory of the case that is supported by the evidence, ‘ ‘no matter how weak or incredible that evidence may be.”
 
 [55]
 
 The State does not dispute that Harkins
 
 *989
 
 presented evidence sufficient to warrant a self-defense instruction on a theory of apparent danger. Upon reentering Deriso’s house after retrieving a gun, Harkins was attacked by Deriso. Harkins testified that it felt like Deriso was stabbing him in the neck with what he thought was an ice pick or a screwdriver. Deriso then allegedly put Harkins in a headlock and stabbed him some more, shouting that he had stabbed Harkins in the jugular.
 

 Over the objection of Harkins and the State, the district court instructed the jury as follows:
 

 Self-defense is a defense to homicide even though the danger to life or personal security may not have been real. If you find that Mr. Harkins, under the circumstances, and from his viewpoint, would have reasonably believed that he was in imminent danger of death or great bodily harm, you may find him not guilty.
 

 Harkins and the State had proposed an alternative jury instruction based upon this court’s decision in
 
 Runion v. State.
 

 [56]
 

 Nevertheless, the district court refused to use the second alternative.
 

 We conclude that the district court erred in giving the instruction, but that the error was harmless beyond a reasonable doubt. The last clause of the instruction states, “you
 
 may
 
 find him not guilty.” This permissible language to the jury is directly contrary to our sample instruction from
 
 Runion,
 
 which states, “If you find that the State has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, you
 
 must
 
 find the defendant not guilty.’ ’
 
 [57]
 

 
 *990
 
 The error is harmless beyond a reasonable doubt, however, in light of several other considerations. Foremost, the district court also gave the jury additional instructions from
 
 Runion.
 
 Another of the jury instructions described the State’s burden of proof to disprove self-defense and provided that if the State failed to meet that burden, the jury “must” find Harkins not guilty:
 

 If evidence of self-defense is present, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the State has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, you
 
 must
 
 find the defendant not guilty.
 

 Thus, the burden-of-proof instruction properly informed the jury of its duty to acquit if the State did not meet its burden.
 

 Additionally, the district court accurately instructed the jury that self-defense is not available to an original aggressor.
 
 [58]
 
 Substantial evidence indicates that Harkins was the original aggressor. Harkins returned to Deriso’s house with a loaded gun after having donned a latex glove. Although Harkins testified that he hid the gun under his shirt when Deriso answered the door, the jury could have reasonably believed that, given the previous altercation, Harkins was the aggressor. Further, Harkins’ apparent danger theory stems from his alleged belief that Deriso stabbed him in the neck with either a screwdriver or an ice pick. However, the police recovered no such implement at the scene. The only similar item recovered was a knife, which had Deriso’s blood, not Harkins’ blood, on it. Harkins also testified that Deriso grabbed him by the hair, but the only clumps of hair recovered from the scene were Deriso’s. Based on these facts and the other, proper, jury instruction, we conclude that the district court’s error in the instruction was harmless beyond a reasonable doubt.
 

 CONCLUSION
 

 Based on the foregoing, we conclude that a dying declaration is an exception to a defendant’s Sixth Amendment confrontation right. We further conclude that Deriso’s statement at issue in this case was nontestimonial under the circumstances and, therefore, its admission did not violate Harkins’ confrontation right. We also conclude that, although the district court erred in its self-defense jury instruction based on apparent danger, the error was harmless beyond a reasonable doubt. Accordingly, we affirm Harkins’ conviction.
 

 Douglas and Parraguirre, JJ., concur.
 

 [1]
 

 541 U.S. 36 (2004).
 

 [2]
 

 Harkins raises three additional arguments on appeal: (1) the prosecution failed to prove beyond a reasonable doubt that Harkins did not act in self-defense, (2) the district court erred by not granting a mistrial based on an outburst by a defense witness that was overheard by several jurors, and (3) the prosecutor committed misconduct by making certain statements during closing argument. We conclude that each argument lacks merit.
 

 [3]
 

 Harkins is not technically Tylo’s stepfather, but Harkins helped raise Tylo for approximately twenty years.
 

 [4]
 

 Pantano
 
 v. State, 122 Nev. 782, 789, 138 P.3d 477, 481 (2006) (citing
 
 Crawford,
 
 541 U.S. at 68).
 

 [5]
 

 448 U.S. 56 (1980).
 

 [6]
 

 Crawford,
 
 541 U.S. at 68.
 

 [7]
 

 See Bishop v. State,
 
 92 Nev. 510, 517, 554 P.2d 266, 271 (1976).
 

 [8]
 

 Id.
 
 at 518, 554 P.2d at 271 (citing
 
 Ennis v. State,
 
 91 Nev. 530, 539 P.2d 114 (1975);
 
 Wilson v. State,
 
 86 Nev. 320, 468 P.2d 346 (1970);
 
 State
 
 v.
 
 Teeter,
 
 65 Nev. 584, 200 P.2d 657 (1948),
 
 overruled on another grounds by Ex Parte Wheeler,
 
 81 Nev. 495, 406 P.2d 713 (1965)).
 

 [9]
 

 Id.
 
 at 518, 554 P.2d at 271-72.
 

 [10]
 

 Crawford, 541 U.S. at 54;
 
 see also People
 
 v.
 
 Monterroso,
 
 101 P.3d 956, 972 (Cal. 2004) (admitting dying declaration as exception to Sixth Amendment confrontation right),
 
 cert. denied,
 
 546 U.S. 834 (2005).
 

 [11]
 

 Crawford,
 
 541 U.S. at 56.
 

 [12]
 

 Id.
 
 at 56 n.6 (citations omitted).
 

 [13]
 

 See, e.g., Monterroso,
 
 101 P.3d at 972;
 
 People v. Gilmore,
 
 828 N.E.2d 293 , 302-03 (Ill. App. Ct. 2005);
 
 State v. Martin,
 
 695 N.W.2d 578, 585-86 (Minn. 2005).
 

 [14]
 

 Monterroso,
 
 101 P.3d at 972 (citing T. Peake,
 
 Evidence
 
 64 (3d ed. 1808)).
 

 [15]
 

 See id.
 
 (citing
 
 King
 
 v.
 
 Reason,
 
 16 How. St. Tr. 1, 24-25 (K.B. 1722)).
 

 [16]
 

 Mattox
 
 v.
 
 United States,
 
 156 U.S. 237, 242 (1895).
 

 [17]
 

 Id.
 
 at 243 (“We are bound to interpret the [Constitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject — such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions in the nature of a [B]ill of [R]ights are subject to exceptions . . . .”).
 

 [18]
 

 Id.
 
 at 243-44.
 

 [19]
 

 Crawford,
 
 541 U.S. at 54.
 

 [20]
 

 For purposes of this opinion, we assume without deciding that a 911 dispatcher is an agent of the police, and therefore, we consider the dispatcher’s acts to be acts of the police. We further assume that Whitton played no intervening role in relaying to Deriso the question asked by the 911 dispatcher. The record indicates that Whitton was merely a conduit for information between the 911 dispatcher and Deriso.
 

 [21]
 

 See Crawford,
 
 541 U.S. at 52.
 

 [22]
 

 Id.
 

 [23]
 

 Id.
 

 [24]
 

 See Davis v. Washington,
 
 547 U.S. _, _, 126 S. Ct. 2266, 2278 (2006) (citing
 
 Crawford,
 
 541 U.S. at 53 n.4).
 

 [25]
 

 See id.
 
 at _, 126 S. Ct. at 2270.
 

 [26]
 

 Id. at _, 126 S. Ct. at 2273-74. For the purposes of its opinion, the Court limited its holding to interrogations.
 
 See id.
 
 at _n.l, 126 S. Ct. at 2274 n.l. The Court was careful to note that statements made in the absence of an interrogation could be considered testimonial and that “even when interrogation exists, it is in the final analysis the declarant’s statements, not the interrogator’s questions that the Confrontation Clause requires us to evaluate.”
 
 Id.
 

 [27]
 

 Id. at _, 126 S. Ct. at 2270-71.
 

 [28]
 

 Id. at _, 126 S. Ct. at 2271-72.
 

 [29]
 

 Id. at _, 126 S. Ct. at 2277.
 

 [30]
 

 Id. at _, 126 S. Ct. at 2276.
 

 [31]
 

 Id. (quoting
 
 Lilly v. Virginia,
 
 527 U.S. 116, 137 (1999)).
 

 [32]
 

 See id.
 

 [33]
 

 Id.
 

 [34]
 

 Id.
 

 [35]
 

 Id.
 

 [36]
 

 Id.
 
 (citing
 
 Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt
 
 Cty., 542 U.S. 177, 186 (2004)).
 

 [37]
 

 Id. at _, 126 S. Ct. at 2276-77.
 

 [38]
 

 Id. at _, 126 S. Ct. at 2277.
 

 [39]
 

 Id.
 
 (quoting
 
 United States v. Inadi,
 
 475 U.S. 387, 394 (1986)).
 

 [40]
 

 Id.
 

 [41]
 

 Id.
 

 [42]
 

 Id.
 
 (“[A]fter the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry’s statements were testimonial, not unlike the ‘structured police questioning’ that occurred in
 
 Crawford.”).
 

 [43]
 

 See id.
 
 at _, 126 S. Ct. at 2278.
 

 [44]
 

 Id.
 

 [45]
 

 Id. at _, 126 S. Ct. 2279.
 

 [46]
 

 121 Nev. 706, 719, 120 P.3d 1170, 1178-79 (2005) (quoting
 
 Crawford,
 
 541 U.S. at 52 (quoting Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3)) (emphasis added in
 
 Flores).
 

 [47]
 

 122 Nev. 346, 143 P.3d 471 (2006).
 

 [48]
 

 See id.
 
 at 354-55, 143 P.3d at 476.
 

 [49]
 

 122 Nev. at 785, 138 P3d at 479. The opinion also addressed the constitutionality of NRS 51.385.
 
 Id.
 

 [50]
 

 Id.
 
 at 791, 138 P.3d at 483.
 

 [51]
 

 Id.
 

 [52]
 

 Flores, 121 Nev. at 719, 120 P.3d at 1178-79 (quoting
 
 Crawford,
 
 541 U.S. at 52 (quoting Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3)) (emphasis added in
 
 Flores).
 

 [53]
 

 Davis,
 
 547 U.S. at _, 126 S. Ct. at 2273.
 

 [54]
 

 As a nontestimonial statement, it is subject to analysis under
 
 Ohio v. Roberts. See Gaxiola v. State,
 
 121 Nev. 638, 646, 119 P.3d 1225, 1231 (2005) (“
 
 ‘Crawford
 
 does not overrule the Court’s pre-existing Confrontation Clause jurisprudence, enunciated in
 
 Ohio v. Roberts,
 
 and its progeny, as it applies to nontestimonial statements.’ ” (quoting
 
 U.S. v. McClain,
 
 377 F.3d 219, 221 n.1 (2d Cir. 2004))). Under
 
 Roberts,
 
 Deriso’s hearsay statement is admissible if it either “(1) falls within a ‘firmly rooted’ hearsay exception, or (2) the statement reflects ‘particularized guarantees of trustworthiness.’ ”
 
 Flores,
 
 121 Nev. at 711, 120 P.3d at 1174 (quoting
 
 Roberts,
 
 448 U.S. at 66). As discussed above, a dying declaration is a firmly rooted hearsay exception. Therefore, the district court correctly admitted the statement under
 
 Roberts
 
 as a dying declaration.
 

 [55]
 

 Runion v. State,
 
 116 Nev. 1041, 1050, 13 P.3d 52, 58 (2000).
 

 [56]
 

 Id.
 
 at 1051-52, 13 P.3d at 59. The relevant sample instruction states,
 

 Actual danger is not necessary to justify a killing in self-defense. A person has a right to defend from apparent danger to the same extent as he would from actual danger. The person killing is justified if:
 

 1. He is confronted by the appearance of imminent danger which arouses in his mind an honest belief and fear that he is about to be killed or suffer great bodily injury; and
 

 2. He acts solely upon these appearances and his fear and actual beliefs; and
 

 3. A reasonable person in a similar situation would believe himself to be in like danger.
 

 The killing is justified even if it develops afterward that the person killing was mistaken about the extent of the danger.
 

 If evidence of self-defense is present, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the State has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant not guilty.
 

 Id.
 

 [57]
 

 Id.
 
 at 1052, 13 P.3d at 59 (emphasis added).
 

 [58]
 

 See id.
 
 at 1051, 13 P.3d at 59.